**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

and

**Graphic Arts International Union, AFL–CIO–CLC, Intervenor,**

v.

**COMMERCIAL LETTER, INC., Respondent.**

No. 73–1247.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1974.

Decided April 22, 1974.

Paul J. Spielberg, Atty., N. L. R. B., Washington, D. C., for petitioner.

Jerome Kalishman, Clayton, Mo., for respondent.

Bruce S. Feldacker, St. Louis, Mo., for intervenor.

Before VOGEL, Senior Circuit Judge, LAY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

This case comes before us upon the application of the National Labor Relations Board (NLRB) for enforcement of a bargaining order issued by it against Commercial Letter, Inc. of St. Louis, Missouri (the company). Once before this unfair labor practice (ULP) case has been before this Court, at which time we refused to enforce the NLRB's order. N.L.R.B. v. Commercial Letter, Inc., 455 F.2d 109 (8th Cir. 1972). In this prior decision the Court remanded the entire matter to the NLRB so that it could hold hearings on certain objections which had been raised by the company regarding the union certification election which had been held earlier among a unit of twelve of its employees and which had resulted in a narrow victory for the union, the Lithographers and Photoengravers International Union (LPIU). On remand, the NLRB assigned the case to an administrative law judge who held two days of hearings on the company's objections in June, 1972. The law judge found that the company's objections had no merit, that the questioned election had been fair and that a bargaining order should issue. The Board issued a supplemental decision in November, 1972, affirming the judge's decision and again ordering the company to bargain with the union. It is this or-

der which the NLRB seeks to have enforced. We grant enforcement.

In 1973, the NLRB was asked to amend the certification of the LPIU as bargaining representative of the company's twelve employees to reflect the merger of that union with another union, the International Brotherhood of Bookbinders, to form the Graphic Arts International Union (GAIU) and the later merger of two locals of the GAIU to form Local 505. A hearing was held by a hearing officer on both amendments and the Regional Director then issued the order substituting the certification of Local 505 for Local 252. The Board granted review of this decision, and affirmed the Regional Director's action.

The company advances three arguments to support its position that enforcement of the bargaining order should be denied. First, it asserts that there was no substantial evidence for the Board's finding that the representation election had been free of irregularities and was valid. Second, it urges that the hearing and decision on remand should not have been in the ULP case, but rather in the representation case so that the company could decide to bargain if the result went against it without being branded as having committed an unfair labor practice. Third, it argues that it has no duty to bargain with GAIU Local 505 anyway because the mergers and resultant changes in bylaws of the union so changed the nature of the certified representative that the NLRB erred in amending the certification rather than ordering another representation election.

## I.

The first two arguments need not and do not detain us for long. The controversy in the case had its origin in the events leading up to the representation election held in August, 1970. The details are set out in our previous opinion. N.L.R.B. v. Commercial Letter, Inc., *supra*, 455 F.2d at 111. Basically, the company refuses to bargain because it claims that the election was tainted by certain prejudicial acts of the union. It maintains that the union needlessly subpoenaed ten of the twelve prospective members of the bargaining unit to a hearing held in June, 1970, to determine the appropriate unit. It further argues that the manner in which the union reimbursed these employees for their attendance was deliberately designed to and did influence their votes in the representation election. The union paid the employees for lost wages after the individual employees went to the union hall and filled out vouchers. At least one of these payments was made on the eve of the election.

Originally the Regional Director and the Board dismissed these claimed irregularities without a hearing and certified the union as bargaining representative. When a ULP charge was subsequently filed due to the company's refusal to bargain, the Board granted a summary judgment against the company, still with no hearing on the election charges having been held. It was this lack of an evidentiary hearing which this Court found objectionable in the earlier opinion. N.L.R.B. v. Commercial Letter, Inc., *supra*, 455 F.2d at 114.

Now, however, this hearing has been held and the NLRB has determined, based on the record made therein, that the union did not act improperly, that the free choice of the employees was not affected and that the election was valid. The Board's overall conclusion as to the validity of the election must be sustained as long as it is supported by substantial evidence on the record considered as a whole. National Labor Relations Act § 10(e), 29 U.S.C. § 160(e); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). After careful review of the record in this case, particularly the evidence adduced at the hearing after the remand, we are convinced that there is substantial evidence to support the Board's determination.

Specifically, there is ample evidence to find that the union subpoenaed the rela-

tively large number of employees in the good faith belief that they might be needed to establish the union's case in the hearing on the appropriate bargaining unit. There is no indication that the company objected at the time. There is also substantial evidence to find, as the Board did, that the union routinely paid all its members and prospective members for time lost on union business by reimbursing their lost wages; that all persons seeking such reimbursement had to go to the union hall to fill out vouchers; and that this procedure was not designed to influence the outcome of elections. Finally, there is adequate evidence to conclude that none of the payments made in this case were designed to nor did they affect the employees' free choice in the election.

■ We conclude that the Board's factual determination is supported by substantial evidence on the record as a whole and must be upheld.

■ When this case was originally remanded to the NLRB by this Court it was not clearly indicated in the opinion in what setting the evidentiary hearing should be held. N.L.R.B. v. Commercial Letter, Inc., *supra*, 455 F.2d at 114. The company contends that the ULP proceedings should have been dropped and the hearing held in the context of its original request for review of the certification granted by the Regional Director. This would mean that the company would then have the option, if it lost on the merits, of agreeing to bargain without being found guilty of a ULP. The NLRB takes the position here that the hearing should be in the context of the ULP case and that upon a finding that the election and resultant certification were valid, the company could be found guilty of an unfair labor practice for its failure to bargain from the date of the certification.

We agree with the Board. As already noted, the Court did not specify the nature of proceedings on remand. The major thrust of our earlier decision was that it denied the company due process of law to find it guilty of a ULP without ever giving it a hearing on its allegations regarding the election. We did not, however, state that the company must be given the option of avoiding the ULP charge if it lost on the merits. What we did say was:

> *At some point in the administrative process* the employer is entitled to have an opportunity to present the evidence upon which he relies and to question the evidence upon which the Board relies, and to submit this evidence for consideration by the Board and by this court in proceedings to enforce or set aside the Board's order.

*Id.* 455 F.2d at 114. (Emphasis supplied.)

That is precisely what has happened here. The company has had its opportunity to present and rebut evidence. Its evidence has been reviewed by an administrative law judge, the Board, and now this Court. Certainly this company has been given adequate due process.

■ Finally, there is a sound policy behind forcing employers to litigate their claims regarding contested elections in the setting of a ULP case after they refuse to bargain. Unless they risked being branded as having committed an unfair labor practice, every employer who did not want a union could challenge every election and refuse to bargain no matter how frivolous the claim. He would have nothing to lose, and considerable time to gain.

## II.

The company launches a twofold attack on the Board's action in amending the certification of the bargaining representative to reflect certain mergers which occurred within the union. First, it asserts that the changes caused by these mergers were so great as to call into question the representative status of the union; therefore, the members of the unit should be allowed to approve or disapprove in another representation election. Along this same line, the company argues that its employees in the

unit were never given the opportunity to vote on the two mergers which took place and that this fact alone should prevent the NLRB from amending the certification.

Secondly, the company urges that the elections which did occur were not carried out with proper procedural safeguards to insure due process. It points to a number of alleged discrepancies in the handling of the voting ranging from unaccounted for ballots to lack of secrecy. When such safeguards are missing, it is contended, the Board should not amend a certification to reflect the results of such an election.

The facts relating to the mergers are as follows:

On September 4, 1972, a merger was effected between the Lithographers and Photoengravers and the Bookbinders union. This merger was approved by the membership of both unions, including the members of LPIU Local 252, the certified bargaining representative of the twelve employees involved in this case. However, none of the employees of Commercial Letter, Inc. were, as yet, union members, since no collective bargaining agreement had been entered into between the company and the union; and, as nonmembers, they did not vote. The product of this international merger was the Graphic Arts International Union, AFL–CIO–CLC (GAIU). LPIU Local 252 became GAIU Local 252. There appears to have been little or no change in the day-to-day operations of Local 252 as a result of the merger of the two unions.

About June 1, 1973, GAIU Local 252 merged with another GAIU local in St. Louis, Local 209. Again, this merger was approved in an election involving the active members of Local 252; although, as before, the employees in the company's unit were not given the opportunity to vote since they were not union members. The result of this merger was the formation of GAIU Local 505.

There were also two further elections —one after each merger was completed —to approve a new set of bylaws first for the new international union and then for the new local. Union members of Local 252 (not including employees of the company), voted in both of these and approved the changes.

■ Whether or not a merged union should continue to be considered the bargaining representative of a unit of employees depends on a factual determination—is it a continuation of the old union under a new name or is it a substantially different organization? N.L.R.B. v. Hershey Chocolate Corp., 297 F.2d 286, 293 (3rd Cir. 1961); Carpinteria Lemon Association v. N.L.R.B., 240 F.2d 554, 557 (9th Cir. 1956), cert. denied, 354 U.S. 909, 77 S.Ct. 1295, 1 L.Ed.2d 1427 (1957).

Such a factual determination is for the Board to make initially and we are precluded by law from reexamining its decision so long as it is supported by substantial evidence on the record as a whole. National Labor Relations Act, § 10(e), 29 U.S.C. § 160(e); Universal Camera Corp. v. N.L.R.B., *supra*, 340 U. S. at 487–488, 71 S.Ct. 456; Carpinteria Lemon Association v. N.L.R.B., *supra*, 240 F.2d at 557.

■ We are satisfied that there is substantial evidence in this record to support the NLRB's finding that GAIU Local 505 is, in fact, a continuation of LPIU Local 252 and is not a substantially different organization. The merger at the international level resulted in virtually no change in the operation of Local 252. The same contracts were still being administered by the same personnel in the same way as before the merger. Membership in the local remained the same. It retained its old officers, address, assets, liabilities, books, bank account, equipment, furniture and other properties. GAIU Local 252 adopted the bylaws of the former LPIU Local 252 in toto.

The merger of Local 252 and Local 209 presents a closer question, but there is, clearly, substantial evidence to support the Board's decision. Local 252

had two thousand members to 209's three hundred. Only one former officer of 209 is an officer of Local 505. All of the officers of Local 252 retained their offices in Local 505. The same collective bargaining agreements are administered by the same personnel in the same manner as before. Shop stewards are the same. Grievances are handled in the same way. Local 505 absorbed the property, assets and liabilities of both Local 252 and 209. The same individual who organized the company's employees involved here will be responsible for contract negotiations with the company.

We recognize that there was conflicting evidence before the Board on this factual question. The local's bylaws were changed to include a probationary membership period which had not been in Local 252's bylaws although the testimony was that this bylaw change merely reflected the past practice of Local 252.[1] There had been a change in the dues structure of the locals. And the relative financial stake of each member of the old Local 252 in the international and the local had been decreased somewhat by the respective mergers. Nonetheless, we cannot say that the Board abused its discretion in deciding as it did; for, as already noted, there is substantial evidence on the record to support its view as well.

■ We reject the company's first argument that all prospective members of a union must be given the chance to vote on internal union reorganization. The Board has specifically held that certain probationary employees who would be forced to join the union at a later date under a union security clause need not be given the right to vote on mergers which do not materially change the relationship between the bargaining representative and the unit employees, espe-

cially if the votes of the probationary employees could not have changed the election result. Hamilton Tool Co., 190 N.L.R.B. No. 114 (1971), 77 L.R.R.M. 1257, 1260; North Electric Co., 165 N.L.R.B. No. 88 (1967), 65 L.R.R.M. 1379, 1380. The conclusion must be that a mere prospective interest in union affairs does not mean that an employee who is not a union member need be given the chance to vote on internal union restructuring, absent a showing, at least, that the votes of those employees could have changed the result of the election. In this case the votes of the twelve company employees could not have changed the result of any of the elections.

Dickey v. N.L.R.B., 217 F.2d 652 (6th Cir. 1954), relied upon heavily by the company is easily distinguishable and simply does not stand for the proposition that all unit employees must be allowed to vote on all union changes, even though not members of the union. Rather, it is a case in which the court disagreed with the Board on the scope of the changes in the union and held that these changes were so substantial as to call into question the representative status of the union. *Id.* at 655. Such was not the case here.

In Union Carbide and Carbon Corp. v. N.L.R.B., 244 F.2d 672 (6th Cir. 1957), also cited by the company, there is no discussion of whether or not unit employees were allowed to vote on the merger of their union with another at an international level. All that the court held therein was that the changes in the bargaining representative were not so substantial as to call into question the union's representative status. *Id.* at 673.

Retail Clerks International Association v. N.L.R.B., 125 U.S.App.D.C. 389,

---

1. The bylaws of Local 505 provide that all candidates for regular membership shall serve a probationary period of twelve months. During this period they are to attend specified educational meetings, and they also are ineligible to receive strike benefits or sacrifice benefits from the International

Union Defense Fund. On the other hand, they are not required to contribute to that fund. While a probationary member, an employee may not change employment without the consent of a local officer in charge of employment; and probationary membership is not transferable to another local.

373 F.2d 655 (1967), is a case closely analogous to this one. In that case the court found that the merger of certain locals of the same international union did not change the relationship between the units and their bargaining representative. There was no showing that the members of the units had approved of the mergers in an election; but the court, nonetheless, allowed the Board to amend the certification to reflect the mergers. *Id.* at 657.

NLRB decisions cited by the company are also distinguishable. Factory Services, Inc., 193 N.L.R.B. No. 102 (1971), 78 L.R.R.M. 1344, is a case in which the local to which the unit belonged was going out of existence and being totally absorbed by a much larger local covering a much larger geographic area. This was not a merger in which the same personnel would be administering the same contracts in the same way. The larger local simply sent its personnel in to take over the operation of the smaller one. In these circumstances the Board refused to amend the certification for the unit whose members had not been allowed to vote on these changes. In short, *Factory Services* was a finding by the Board that the new local was not a continuation of the old. Factory Services, Inc., *supra*, 78 L.R.R.M. at 1345–46. Rinker Materials Corp., 162 N.L.R.B. No. 156 (1967), 64 L.R.R.M. 1223, presents a similar situation. Again, the thrust of the Board's decision seems to be based on the degree of change in the nature of the local, although it also faults the failure of the unit employees to vote in the merger election.

In summary, we conclude that there was substantial evidence to support the Board's conclusion that the new local was a continuation of the old local. Since the changes were, then, primarily

in the internal makeup of the union, there is no requirement that prospective members be allowed to vote on them.

The company also contends that the procedures used in conducting the various merger elections in the St. Louis local did not rise to the standards necessary to insure due process and that therefore, these elections and resultant mergers were invalid. We find no merit to this argument.[2]

The relevant testimony and evidence indicate that in all four elections the following procedures were used: An attempt was made to provide every active and inactive union member with a ballot. For those who were actually working in a union shop, ballots along with plain white envelopes were picked up by shop chairmen at the local's headquarters. These ballots were then distributed by the shop chairmen to union members, who signed for them. The members were free to vote or not to vote. At any rate, they did so in private, placed the marked ballot in the envelope and returned it to the shop chairman, initialing a list to indicate they had returned the ballot. Ballots and envelopes were mailed to all inactive members and all those whose shop chairmen did not get to headquarters to pick up blank ones. Since those receiving ballots were free to not vote and to not return them, many of those distributed were never returned.

The company makes two specific complaints. First, it points to testimony given by an executive vice-president of Local 505 to the effect that it is possible that some voted ballots were not picked up or counted. It notes that the number of unreturned ballots could have changed the outcome of any of the elections. Therefore, it argues, none of the elections should be considered valid. Sec-

2. We note that none of the employees, the people most intimately concerned with election procedures for the union, has complained about the procedures used here. As we have found, the company illegally refused to bargain. If it had bargained and entered into a contract after the representation election in 1970, the employees would have been required to join the union and could have voted in the merger election. In these circumstances it would be unfair to allow the company to rely on the inability of its employees to vote in the merger election.

ondly, it urges that the election procedure did not provide adequate safeguards to insure secrecy.

The Regional Director considered all of the company's claims and found properly that there was no support in the evidence for any of them. There is no indication that any voted ballots were, in fact, not counted by the canvassing committee of the local.[3] Nor is there any indication that the secrecy of any of the member's votes was violated.

We point out that the Board has never laid down hard and fast rules regarding the manner in which merger elections must be conducted. In North Electric Co., *supra*, 65 L.R.R.M. at 1380, relied upon by the company, all that was said was that the vote was "taken by secret ballot." This was at a meeting attended by only 55 of 238 union members. *Id.* at 1379 and n. 4. Nowhere in that case does the Board say that this is the required procedure.

In Hamilton Tool Co., *supra*, 77 L.R.R.M. at 1258, the vote on affiliation was carried out quite formally, with each voter at the special meeting going into an enclosed voting booth to mark his ballot. Again, however, the Board did not mandate this method of election but rather the Board pointed out that such merger elections need not measure up procedurally to the Board's own standards in representation elections and set the standard for these elections in the following language:

> While the procedures used during this union election may not measure up to the standards the Board demands for its own elections, on the facts of this case, we are not willing to find that the procedures used were so lax or so "substantially irregular" as to negate the validity of the election . . . ."

*Id.* at 1260.

Likewise, in Fall River House, Inc., 198 N.L.R.B. No. 164 (1972), 81 L.R.R.M. 1056, 1056–57, the Board noted that it does not amend certifications to reflect mergers when such change occurred "under circumstances that do not indicate that it reflected a majority view."

This indicates a flexible position on the part of the Board; one designed to insure that the facts of each particular case are reviewed. The Board is not locked into a rigid requirement of certain specific election procedures. Rather, the NLRB fact finder must weigh the evidence and be satisfied that the election was carried out in such a way as to reflect the majority view.

In the instant case we are satisfied that this was done. A review of the record clearly supports the decision of the Regional Director.

Enforcement of the Board's bargaining order is granted.

---

3. Executive Vice-President Mantei of Local 505 testified that it was "possible" that some voted ballots had not been counted. However, there is no proof that this actually occurred. There were comments typed on one of the exhibits, which was a tally sheet used in one of the elections, which might have indicated that some voted ballots at specific shops were not picked up and counted. However, the testimony about these typed in comments is confusing and Mantei stated at one point in his testimony that these notations merely meant that the shop chairmen had not picked up blank ballots before the election and that these had been mailed out to the affected members instead.