**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INSULFAB PLASTICS, INC., NEW ENGLAND DIVISION, Respondent.**

**No. 85–1772.**

United States Court of Appeals, First Circuit.

Argued March 4, 1986.

Decided April 24, 1986.

Duane R. Batista, with whom Nutter, McClennen & Fish, Boston, Mass., was on brief, for respondent.

L. Pat Wynns with whom Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, and Elliott Moore, Deputy Associate General Counsel, Washington, D.C., were on brief, for petitioner.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and PETTINE,* Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

The question raised in this petition for enforcement of a National Labor Relations Board bargaining order is whether an employer must continue to recognize and bargain with a formerly independent local union once the union has affiliated with a large international union. The employer insists that it need not do so unless and until the Board formally certifies the affiliated union after a representation election.

* Of the District of Rhode Island, sitting by desig-

The Board has held, to the contrary, that an election and certification proceeding is unnecessary and that the employer commits an unfair labor practice by refusing to bargain. Thus the Board has ordered the employer to recognize and bargain with the affiliated union.

I.

The employer, Insulfab Plastics, Inc. ("Insulfab" or the "Company"), manufactures and sells plastic products at a plant in Watertown, Massachusetts. For over 25 years it had a collective bargaining relationship with an in-house union known as the Independent Workers of Insulfab (the "Union"), which represents the production and maintenance employees at the Watertown plant. In August of 1983, when the events in this case occurred, there were 32 such employees, all of whom belonged to the Union.

During contract negotiations in late 1982, members of the Union became dissatisfied with their inability to obtain wage increases from Insulfab and began discussing the possibility of affiliating with an international union. In late 1982 and again in early 1983, Union President Joseph P. Flanagan contacted Vincent J. Campbell, the Director of Organization for the New England area of the International Union of Electrical, Technical, Salaried and Machine Workers, AFL–CIO ("IUE"). At a regular membership meeting on August 9, 1983, after a presentation by IUE representatives, the approximately 20 members in attendance voted unanimously to hold a meeting for the purpose of voting on affiliating with the IUE.

A few days later, Flanagan posted a notice on the Union bulletin board at the plant informing the Union's membership about a special meeting to be held on August 17, 1983, to vote on whether to affiliate with the IUE. Copies of this notice were also mailed to all Union members, and copies were handed to employees at the plant. At the August 17 meeting, attended

nation.

by 29 of the Union's 32 members, Campbell explained what affiliation with the IUE would entail. After discussion among the members, an employee moved for a secret ballot vote. Each member then wrote either "yes" (in favor of affiliation) or "no" (against it) on a piece of paper, and the votes were counted in view of the members by two employees appointed by Flanagan to do so. The final tally was 20 in favor (including a voice vote by a latecomer to the meeting), eight against, and one blank. Subsequently, all but one member in attendance voted to make the affiliation decision unanimous.

Following the election, Flanagan sent a letter to Patrick J. Nicolazzo, Insulfab's General Manager, informing him of the election results, and stating (imprecisely) that the IUE was now the employees' bargaining agent. Nicolazzo replied that the Company "does not believe that the IUE–AFL–CIO represents a majority of [its] employees in any proper group," and refused to recognize the IUE until it was certified by the Board. Thereafter Flanagan and Nicolazzo, as well as Campbell and Nicolazzo, exchanged a series of letters in which Flanagan made clear that the bargaining representative was the affiliated Union (which continued to operate under the name of Independent Workers of Insulfab) rather than the IUE itself, and that the IUE's role would be limited to assisting in servicing the membership. The Company continued to insist, however, that it would not recognize the Union until it was certified in a Board election.

First the IUE, and later the Union, filed an unfair labor practice complaint against Insulfab, alleging that the Company wrongfully refused to recognize and to bargain with the Union in violation of sections 8(a)(1) and (5) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1) & (5) (1982). On March 11, 1985, the Board adopted without comment the administrative law judge's findings and conclusions that Insulfab violated the Act in refusing to bargain since there was sufficient continuity in the identity of the bargaining agent and the election had been procedurally fair. 274 NLRB No. 126 (1985). The Board ordered Insulfab to recognize and to bargain with the affiliated Union as the exclusive collective bargaining representative of the production and maintenance employees at the Watertown plant. Also, it required the Company to furnish the Union with the requested information about job classifications, wages, seniority, and other data reasonably related to the latter's bargaining responsibilities.

## II.

The Act requires an employer to bargain in good faith with the exclusive bargaining representative selected by a majority of its employees in an appropriate bargaining unit. 29 U.S.C. §§ 158(a)(5), 159(a) (1982). Insulfab contends that it need no longer bargain with the Union, which it has recognized for over 25 years, because the membership's decision to affiliate with the IUE so substantially altered the Union as to create an essentially new bargaining representative. In the Company's view, a "question of representation" exists, requiring the Board to conduct a representation election by secret ballot to decide whether a majority of the employees now support the affiliated Union. 29 U.S.C. § 159(c) (1982).

■ But the Board has long held, and courts (including most recently the Supreme Court) have recognized, that organizational changes such as affiliations or mergers do not inevitably raise a "question of representation" so as to necessitate a representation election.[1] So long as the changes are not sufficiently dramatic to

1. See, e.g., NLRB v. Financial Institution Employees, Local 1182, —— U.S. ——, ——, 106 S.Ct. 1007, 1011–17, 89 L.Ed.2d 151 (1986) (striking down as an unauthorized intrusion into internal union affairs a Board requirement that a union permit nonunion employees to vote in an affiliation election); J. Ray McDermott & Co. v. NLRB, 571 F.2d 850, 857–58 (5th Cir.), cert. denied, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978); NLRB v. Pearl Bookbinding Co., 517 F.2d 1108, 1111–12 (1st Cir.1975); NLRB v. Commercial Letter, Inc., 496 F.2d 35, 38–41 (8th Cir.1974).

alter the union's identity, a decision to affiliate is an internal union matter that does not affect the representative status of the bargaining agent or end the employer's duty to continue its relationship with that union. Otherwise, the Board has reasoned, "[t]he industrial stability sought by the Act would unnecessarily be disrupted if every union organizational adjustment were to result in displacement of the employer-bargaining representative relationship." *Canton Sign Co.*, 174 NLRB 906, 909 (1969), *enforcement denied on other grounds*, 457 F.2d 832 (6th Cir.1972).

■ Under the Board's current test, an employer must continue to bargain with the existing bargaining agent if two conditions are met. *See NLRB v. Financial Institution Employees, Local 1182,* —— U.S. ——, ——, 106 S.Ct. 1007, 1012, 89 L.Ed.2d 151 (1986). First, the employees in the bargaining unit must have had a fair opportunity, with adequate due process safeguards, to approve the organizational change. *See, e.g., Newspapers, Inc.*, 210 NLRB 8, 9 (1974), *enforced, NLRB v. Newspapers, Inc.*, 515 F.2d 334 (5th Cir. 1975). Second, there must be "substantial continuity" between the pre-affiliation and the post-affiliation union. *See, e.g., NLRB v. Pearl Bookbinding Co.*, 517 F.2d 1108, 1111–12 (1st Cir.1975). Here, the Board determined that both requirements were satisfied and that therefore the results of the affiliation election were valid. Based on the record as a whole, we uphold the Board's findings as supported by substantial evidence.

### A. Due Process Standards

■ For the Union's vote in favor of affiliation to meet the Board's standards, it must accurately reflect the sentiments of a majority of the employees in the bargaining unit. *See NLRB v. Commercial Letter, Inc.*, 496 F.2d 35, 42 (1974); *Hamilton Tool Co.*, 190 NLRB 571, 574 (1971). This means that the election must "be conducted with adequate 'due process' safeguards, including notice of the election to all members, an adequate opportunity for members to discuss the election, and reasonable precautions to maintain ballot secrecy." *Financial Institution*, —— U.S. at ——, 106 S.Ct. at 1012. We find substantial evidence supporting the Board's finding that the Union's choice "to conduct its business more informally in accordance with the traditions of New England town meeting democracy" met the necessary due process standards.

First, it appears that members of the Union had adequate notice that an election to decide whether to affiliate with the IUE would be held. Several days after the issue of affiliation was initially discussed at the regular membership meeting on August 5, 1983, Union President Flanagan posted on the Union bulletin board at the plant a notice of the special affiliation election meeting to be held on August 17. In addition, copies of the notice were mailed to all unit members, and copies were also distributed at the plant. All but three of the 32 members of the Union attended the meeting, which was held at the customary time and location of regular Union meetings.

Moreover, contrary to Insulfab's contention, there is sufficient evidence from which to conclude that the employees were adequately informed as to the effects of affiliation and that they had sufficient opportunity for discussion before voting. IUE representatives explained the supposed advantages of affiliating. They stated that the officers would remain the same, that the IUE would come in, if requested, to assist in bargaining and in the processing of grievances, that the membership retained the final decision on striking, and that the dues would increase somewhat after affiliation. Before voting, the employees had a chance to discuss the pros and cons of affiliation outside the presence of the IUE spokesmen. While Union members were not informed of every change that would take place, there is substantial evidence in support of the Board's finding that the Union members were adequately informed.

The Company charges that there was no impartial party present during the voting

and that the voting did not follow proper rules of procedure. But we believe the Board was entitled to find, as it did, that the voting procedures, while informal, met minimal due process standards. Voting was by secret ballot, after the IUE representatives left the room. Employees preserved some measure of privacy by turning their backs to the others or by cupping their hands over their ballots. The ballots were publicly tallied by two employees. When asked if everyone was satisfied with the voting procedure, no one voiced any objection or discontent. Indeed, after the results of the secret ballot were announced, the members voted 28 to 1 to make the affiliation decision unanimous.

Insulfab has failed to point to any evidence that the affiliation election did not, in fact, reflect the views of a large majority of the employees. For example, no one in the bargaining unit is shown to have come forward to oppose the results of the affiliation election. Thus we find sufficient support for the Board's determination that the Union's decision to affiliate reflected the considered choice of the majority of the bargaining unit employees.

B. *Substantial Continuity of Representation*

■ Whether a union's identity has remained essentially the same or whether it has changed so substantially as to require a new representation election depends on a factual determination by the Board after it examines the various changes that affiliation may effect. *J. Ray McDermott & Co. v. NLRB*, 571 F.2d 850, 857 (5th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978). The Board generally considers a number of factors, including "structure, administration, officers, assets, membership, autonomy, by-laws, size," *NLRB v. Pearl Bookbinding*, 517 F.2d 1108, 1111–12 (1st Cir.1975), and looks for

changes "in the rights and obligations of the union's leadership and membership, and in the relationships between the putative bargaining agent, its affiliate, and the employer," *McDermott*, 571 F.2d at 857. *See also St. Vincent Hospital v. NLRB*, 621 F.2d 1054, 1057 (10th Cir.1980). So long as the Board's conclusion is supported by substantial evidence on the record as a whole, we must affirm. 29 U.S.C. § 160(e) (1982); *NLRB v. Commercial Letter, Inc.*, 496 F.2d 35, 39 (8th Cir.1974).

■ Here, the Board found that affiliating with the IUE does not significantly change the Union's identity.[2] The bargaining unit will remain unchanged, and the officers (as well as those responsible for negotiating and processing employee grievances) will also remain the same. Retaining the same key personnel is important, for "[w]hen the same persons participate in communications with the company with respect to grievances, contract negotiations, and the like, continuity is likely to be preserved." *St. Vincent Hospital*, 621 F.2d at 1057. *Compare Retail Store Employees Union, Local 428 v. NLRB*, 528 F.2d 1225, 1228 (9th Cir.1975) (per curiam) (affirming a Board finding that there was no substantial continuity because of a leadership change). The Union, moreover, says it will honor any existing contractual commitments to Insulfab, and its activities will continue to be governed for the most part by its own constitution and bylaws.

Insulfab contends, nonetheless, that when a small independent union affiliates with a large international union of several hundred thousand members, the changes accompanying affiliation are necessarily so great as to create an essentially new bargaining entity. Once the Union affiliates, Insulfab asserts, the IUE's constitution will significantly affect the autonomy the Union enjoyed as an independent. That

---

2. Insulfab argues that the ALJ's finding of substantial continuity, which the Board adopted, was based on the mistaken assumption that the Union had already affiliated when it in fact had not, pending a resolution of this case. But, even if such a misapprehension existed, we believe

that the ALJ considered the effects of affiliation on the Union and articulated grounds adequate to sustain the Board's finding of continuity. *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 853, 85 L.Ed. 1271 (1941) (requiring disclosure of the basis of an agency's order).

document, it is true, places certain obligations on the Union, such as payment of minimum dues, affiliation with district councils, and IUE approval before the membership can change the Union's constitution. The Board supportably found, however, that the Union's local autonomy is not significantly curtailed. The Union continues to retain control over negotiating and administering contracts, processing grievances, and calling strikes, with assistance from the IUE only when requested. The Board also found that "the money which currently reposes in the Independent's treasury will remain there, to be spent by the [Union] for its own purposes and at its sole discretion."

In urging what would amount to a per se rule that affiliation of a small independent with a much larger union creates a substantially different bargaining entity, Insulfab relies on three Third Circuit decisions: *American Bridge Division, U.S. Steel Corp. v. NLRB*, 457 F.2d 660, 664 (3d Cir.1972), *NLRB v. Bernard Gloekler North East Co.*, 540 F.2d 197 (3d Cir.1976), and *Sun Oil Co. v. NLRB*, 576 F.2d 553 (3d Cir.1978). Those cases, however, are distinguishable.

In *American Bridge*, the court concluded that the local was "far different" after affiliation because, unlike here, the international's constitution substantially limited the union's autonomy by giving the international responsibility over collective bargaining, grievance settlement, and calling strikes. Moreover, the court was apparently influenced in its conclusion that a representation election was necessary by the presence of many procedural irregularities, including the refusal by the union's executive committee to hold a special meeting to discuss affiliation despite the petition of more than 100 (out of some 300) members requesting such a meeting. Here, in sharp contrast, a majority of the Union membership clearly approved the affiliation in a procedurally valid election.

Similarly, the court in *Bernard Gloekler* found that the union, by affiliating with the pre-existing local affiliate of the United Auto Workers ("UAW"), lost substantial control over its affairs, and that the structure, administration, assets, membership, autonomy, and by-laws all changed as a result. Moreover, before the affiliation vote, the UAW local had tried unsuccessfully to oust the independent by demanding a representation election. Thus the court invalidated the results of the affiliation vote in part because of its concern that the UAW local was using affiliation as a stratagem to avoid the "contract bar" rule that prohibited any representation election from taking place during the term of a collective bargaining agreement. No such concern is present here.

*Sun Oil* is also different from the instant case. The dispute arose there only *after* a representation election had been held at the Board's behest. In deciding that the company was not bound by collective bargaining agreements negotiated by the two independent unions before they affiliated with a large international, the court reasoned that the Board's agreement to conduct a representation election showed that, despite its position to the contrary on appeal, "the Board [had] determined, in effect, that the employees had a choice between different and distinct bargaining representatives or none." 576 F.2d at 557. Moreover, the *Sun Oil* court also found that the local independent's constitution and by-laws were "largely superseded" by the international's, and that the local was "abandoning independence for international affiliation." *Id.*

■ To be sure, in both *Gloeckler* and *Sun Oil* the Third Circuit attached considerable weight to the fact that an affiliated union can "flex considerably more bargaining muscle than the 30-person local independent." *Sun Oil*, 576 F.2d at 557. But the notion that a question of representation is created simply by the increase in a union's bargaining power caused by affiliation has no express basis in the Act, and has been rejected by the Board. *See New Orleans Publishing Service, Inc.*, 237 NLRB No. 134 (1978); *Newspapers, Inc.*, 210 NLRB No. 8 (1974), *enforced*, 515 F.2d 334 (5th Cir.1975). The Supreme Court's recent decision in *Financial Institution*

likewise suggests that an increase in a union's bargaining power is not, standing alone, determinative of whether affiliation raises "a question of representation." Observing that there may be a variety of reasons why a local union might seek to affiliate ("the larger organization may provide bargaining expertise or financial support, or may compensate for a lack of leadership within the local union"), the Court noted that the Board has recognized that a union " 'must remain largely unfettered in its organizational quest for financial stability and aid in the negotiating process.' " —— U.S. at —— n. 5, 106 S.Ct. at 1011–12 n. 5 (*quoting The William Co.*, 244 NLRB 953, 955 (1979)).

▇ Especially where the union membership has expressed its desire to affiliate (at least in part to improve its bargaining posture), and the continuing majority support of the original bargaining representative is not in doubt, we are not inclined to override the Board's judgment that substantial continuity exists and to adopt instead Insulfab's suggested per se rule. Even the Third Circuit has recognized that determining whether substantial continuity exists is a fact-specific determination, to be made by the Board in the first instance after considering the particular effects of an organizational change. This makes sense since not every international exerts the same degree of control over its member locals, and the terms of affiliation will differ from case to case. Moreover, the Supreme Court in *Financial Institution* explicitly rejected the argument that affiliation *by itself* necessarily changes the union's identity and results in employees being represented by a different organization; rather, the Court asserted that unless a question of representation is raised, an affiliation vote is a purely internal union affair. —— U.S. at —— ——, 106 S.Ct. at 1011–15.

▇ Here, there is substantial evidence to support the Board's finding that the affiliation does not raise a question of representation. Moreover, since Congress has entrusted the Board with the authority to interpret and implement the Act, we have generally allowed the Board wide latitude to construe its provisions and to determine how best to effectuate the Act's policies, especially in areas implicating, as here, agency expertise. Thus such a Board decision should be sustained as long as it is not irrational or inconsistent with the Act. *See Financial Institution*, —— U.S. at ——, 106 S.Ct. at 1013; *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978). The Board's judgment in this case that a small independent's affiliation with a large international does not raise a question of representation, particularly where the membership freely chose to continue its support of its bargaining agent, is consistent with both the policy against unnecessary outside interference with union decision-making and the policy in favor of maintaining stability in the bargaining representative. *See* —— U.S. at —— – ——, 106 S.Ct. at 1013–16.

*Enforcement of the Board's order is granted.*