United States Court of Appeals
For the First Circuit

No. 94-1569

IN RE: ROSEMARY PYE,
ON BEHALF OF NATIONAL LABOR RELATIONS BOARD,

Plaintiff, Appellant,

v.

SULLIVAN BROTHERS PRINTERS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Torruella, Chief Judge,

Campbell, Senior Circuit Judge,

and Stahl, Circuit Judge.

John A. Mantz, Attorney for National Labor Relations Board, with

whom Ellen A. Farrell, Assistant General Counsel, Frederick L.

Feinstein, General Counsel, Robert E. Allen, Associate General

Counsel, and Corinna L. Metcalf, Deputy Assistant General Counsel,

were on brief for appellant.
Robert P. Corcoran with whom Gleeson & Corcoran was on brief for

appellee.

October 26, 1994

STAHL, Circuit Judge. The National Labor Relations
STAHL, Circuit Judge.

Board appeals the denial of its petition for a preliminary

injunction requiring Sullivan Brothers Printers, Inc., to

recognize and bargain with Local 600M, Graphic Communications

International Union ("GCIU"), AFL-CIO, as the exclusive

representative of the Sullivan Brothers pressmen and

bookbinders. The issue at the core of the dispute is whether

Local 600M had properly assumed the mantle of two smaller,

now-defunct locals that formerly represented the company's

pressmen and bookbinders. The district court concluded that

the Board had failed to demonstrate a likelihood of success

in the underlying proceeding and denied its petition for

interim relief. Finding no abuse of discretion by the

district court, we now affirm.

I.

Background

A. The Demise of Locals 109C and 139B

The relevant facts are undisputed. Sullivan

Brothers is a commercial printing concern located in Lowell,

Massachusetts. For more than thirty years, two separate

locals represented the company's pressmen and bookbinders --

Local 109C and Local 139B, respectively, both affiliates of

GCIU. Local 109C was the larger of the two locals,

representing in 1990 more than 250 workers at five companies

in the Lowell area, including eighteen pressmen at Sullivan

-2-
2

Brothers. Local 139B represented about 135 bookbinders and

general helpers at two companies in the same area,

approximately ten of whom were employed by Sullivan Brothers.

The vast majority of the members of each local -- as many as

240 members of 109C, and 125 members of 139B -- worked at

another printing company, North American Directory

Corporation ("NADCO"). Historically, NADCO workers dominated

the leadership roles of both locals, occupying virtually all

of the officer and executive board positions.

In June 1991, NADCO shut down its bindery, and in

February 1993, it closed its plant altogether. NADCO's

closing reduced Local 109C to roughly forty members -- about

fifteen employed by Sullivan Brothers -- and Local 139B to

just eight to ten members, all at Sullivan Brothers. The

shutdowns also left the two locals largely without

leadership. Following the 1991 bindery closing, Local 139B

president Oscar Becht and secretary-treasurer Jeannette

Pickels, both NADCO employees, were the only local officers

or directors remaining in office, having obtained other jobs

in the NADCO plant pending the 1993 shutdown date. Local

109C president Henry Boermeester, a NADCO pressman, announced

at a membership meeting in 1992 that he would step down when

the plant closed the following year. None of the few dozen

remaining members of the two locals expressed interest in

filling any of the leadership positions at either local.

-3-
3

With membership at low levels -- the GCIU

constitution permits the international to rescind a local's

charter when membership dips below fifty -- Boermeester and

Becht began to explore and discuss with their members the

possibility of merging the two locals or transferring1 them

to a larger local. The unwillingness of any remaining 109C

and 139B members to assume leadership positions made merging

the two locals impracticable.2 Thus, in January 1993, Local

109C members voted to surrender their charter and transfer to

Local 600M, a GCIU local headquartered in Boston comprising

about 700 workers in the printing industry. The

administrative transfer became effective on July 1, 1993.

Local 139B members followed suit in March, with the transfer

effective on May 1, 1993. The two locals' assets, totalling

about $15,000, were transferred to Local 600M with no

1. Under the GCIU constitution and by-laws, two locals merge
when both surrender their respective charters and negotiate a

new set of governing by-laws acceptable to the members of
both merging locals. That document is then put to a secret
ballot vote and, if approved, a new charter is issued to the
new entity. An administrative transfer, on the other hand,
occurs when one GCIU local surrenders its charter and its

members vote to join, and are accepted by, another GCIU
local. The accepting local's charter and by-laws remain
intact.

2. At the administrative hearing on the underlying
complaint, Local 109C president Boermeester testified as
follows: "Well, if they had merged together to form a Union,
there still has to be somebody to lead the Union. Between
the two groups or two units, there was still no leadership."

-4-
4

condition that they be used for the benefit of the 109C or

139B members.

-5-
5

B. Local 600M

Since they had joined a sister GCIU local, the

former 109C and 139B members were still subject to the

International's constitution and by-laws. Local 600M's

structure, constitution and by-laws, however, differ from

those of former locals 109C and 139B in a number of ways:

(1) Local 600M's territory extends well beyond the

Lowell area, covering about forty shops throughout

eastern Massachusetts and southern New Hampshire.

Its trade jurisdiction is also greater: while

approximately 500 of its 700 members work in the

same classifications as the 139B and 109C members,

Local 600M accepts all types of printing industry

workers, including shipping clerks, truck drivers,

and envelope and box manufacturers.

(2) Local 600M dues are calculated on a sliding

scale based on salary, rather than on a flat rate,

as locals 109C and 139B calculated dues; thus, the

pressmen would see their dues increase from $8 to

$9.22 per week, while the bookbinders' dues would

increase from $6 to $7.95.3

(3) Contract negotiation and ratification, as well

as strike authorization, could also be different at

3. Local 600M is not currently collecting dues from the
former 109C and 139B members because of Sullivan Brothers'
refusal to recognize it.

-6-
6

Local 600M. As 109C and 139B members, the Sullivan

Brothers bookbinders and pressmen were free to

suggest contract terms for upcoming negotiations in

informal "proposals meetings" held with their

negotiators at a local donut shop or on the shop

floor. A Local 600M by-law, however, requires

members to submit proposed contract terms in

writing to the president of the local at least

ninety days before the contract expiration date.

Another by-law gives the executive board the power

to accept a contract against the wishes of a

particular bargaining unit if the bargaining unit

fails to approve the contract and at the same time

fails to authorize, by a two-thirds majority,

further action up to and including a strike.

Locals 139B and 109C had no such by-law provisions.

Local 600M by-laws also empower the executive

board, on its own, to call a strike in unspecified

"special cases" for any bargaining unit comprising

fewer than twenty-five members -- a category that

includes the Sullivan Brothers pressmen's and

bookbinders' units.

(4) Local 600M's by-laws impose a number of new

work restrictions on the Sullivan Brothers pressmen

and bookbinders. As members of Local 600M, they

-7-
7

may not: solicit or accept work without union

consent; perform trade work outside the shop where

they are regularly employed without union

permission; work for wages less than those provided

for in the contract under which they are covered

without union approval; work overtime contrary to

executive board order; or take vacation other than

as prescribed by their governing contracts absent

executive board permission to take money instead of

scheduled vacation time.

(5) The leadership of Local 600M is almost

entirely different from that of 109C and 139B. Of

the defunct locals' two dozen officers and

directors, only Boermeester assumed any kind of

role in Local 600M (or even joined it). With the

aid of Local 600M president George Carlsen,

Boermeester obtained a seat on the local's

executive board for the duration of a departing

board member's term. Local 139B president Becht

was offered a position on 600M's board and was

asked to assist in upcoming contract negotiations

with Sullivan Brothers, but he turned down the

board position and made only a tentative commitment

to the negotiations, depending upon his

availability. In addition, Steven Wysocki, Local

-8-
8

109C's "chapel chairman," or shop steward, at

Sullivan Brothers, continued in the same capacity

for the pressmen's unit of 600M. Boermeester and

Wysocki, who along with another 109C officer had

negotiated Local 109C's previous contracts with

Sullivan Brothers, agreed to help Carlsen negotiate

the next contract when the current contract expired

in 1995. Boermeester already has negotiated

contracts for the other two former 109C shops

subsumed by 600M.

C. The Current Dispute

On July 6, 1993, Local 600M formally notified

Sullivan Brothers of the administrative transfers and asked

the company to recognize and bargain with it as the exclusive

representative of the former 109C and 139B members. The

contract between 139B and Sullivan Brothers was due to expire

on August 31, 1993; 109C's contract was effective through May

31, 1995. Local 600M proposed that Sullivan Brothers simply

extend the 139B contract so that it expired contemporaneously

with the 109C contract -- adjusting it in the interim for

wage and benefit increases granted in 109C's most recent

contract -- so that contracts (or possibly a single contract)

could be negotiated for the two units at the same time. On

August 11, 1993, Sullivan Brothers informed Local 600M that

it did not consider itself bound by the transfer and refused

-9-
9

to recognize Local 600M. In addition, beginning on July 1,

1993, Sullivan Brothers took unilateral actions that Local

600M alleges unlawfully altered some of the terms and

conditions of employment in the bookbinders' and pressmen's

units.4

Sullivan Brothers' refusal to recognize Local 600M

prompted Local 600M to file an unfair labor practice charge

with the NLRB on August 23, 1993. The Board issued an unfair

labor practice complaint on October 28, 1993, subsequently

amended on January 20, 1994, which charged Sullivan Brothers

with violating sections 8(a)(1) and (5) of the National Labor

Relations Act, 29 U.S.C. 158(a)(1) and (5), for refusing

to bargain with Local 600M and for unilaterally changing the

terms and conditions of employment. An administrative law

judge ("ALJ") conducted a hearing on the matter on February 3

and 4, 1994.5 On March 7, 1994, more than six months after

4. Sullivan Brothers: (1) ceased making contributions to
the employees' pension plans; (2) announced a new 401(k)
plan; (3) ceased deducting union dues and remitting them to
the employees' bargaining representatives; (4) installed and
began to use new equipment in the pressmen's unit; (5)
granted wage increases to employees in the bookbinders' unit;
(6) gave Christmas bonuses to employees in both units; and
(7) implemented a proofreading bonus program for employees in
both units.

5. On July 15, 1994, the ALJ issued his decision on the
underlying complaint. The ALJ found that Local 600M was in
fact the successor to Local 109C and that Sullivan Brothers
had an obligation to bargain with it. The ALJ also found
that Sullivan Brothers had no obligation to recognize Local
600M as Local 139B's successor because the vote to transfer
violated minimal standards of due process. We accord the

-10-
10

it initially received the union's complaint, and more than

four months after it had issued its own complaint, the Board

petitioned the district court for a temporary injunction

pursuant to section 10(j) of the Act, 29 U.S.C. 160(j).6

The petition sought an order requiring Sullivan Brothers,

pending final resolution of the issues raised in the

underlying complaint, to recognize and bargain with Local

600M as the representative of the pressmen's and bookbinders'

units, and to rescind, upon Local 600M's request, certain

unilateral changes made in the terms and conditions of the

members' employment. The district court found that "a

question exists as to the continuity of representation

ALJ's decision, coming after the district court's ruling, "no
independent weight in assessing whether the court erred,"
Maram v. Universidad Interamericana de Puerto Rico, 722 F.2d

953, 959 (1st Cir. 1983). Since the district court based its
findings and conclusions on the administrative hearing
record, we note that, to the extent it proves useful, "it is
appropriate to look to evidence the ALJ points to that was
before the court, but of which the court failed to take
note." Id.

6. Section 10(j) provides:
The Board shall have power, upon issuance
of a complaint as provided in subsection
(b) of this section charging that any
person has engaged in or is engaging in
an unfair labor practice, to petition . .
. for appropriate temporary relief or
restraining order. Upon the filing of
any such petition the court shall cause
notice thereof to be served upon such
person, and thereupon shall have
jurisdiction to grant to the Board such
temporary relief or restraining order as
it deems just and proper.

-11-
11

provided by Local 600M" and that the Board had failed to

establish a likelihood of success on the merits, and

concluded that injunctive relief was not just and proper.

This appeal followed.

II.

The Section 10(j) Preliminary Injunction Standard

In considering a petition for interim relief under

section 10(j), a district court must limit its inquiry to

whether (1) the Board has shown reasonable cause to believe

that the defendant has committed the unlawful labor practices

alleged, and (2) whether injunctive relief is, in the

language of the statute, "just and proper." See Asseo v.

Centro Medico del Turabo, 900 F.2d 445, 450 (1st Cir. 1990);

Asseo v. Pan American Grain Co., 805 F.2d 23, 25 (1st Cir.

1986); Maram v. Universidad Interamericana de Puerto Rico,

Inc., 722 F.2d 953, 958 (1st Cir. 1983). The district court

is not empowered to decide whether an unfair labor practice

actually occurred. Centro Medico del Turabo, 900 F.2d at

450. In assessing whether the Board has shown reasonable

cause, the district court need only find that the Board's

position is "fairly supported by the evidence." Id. In

satisfying the court that injunctive relief is just and

proper, however, the Board faces a much higher hurdle, for

here the district court must examine "the whole panoply of

discretionary issues with respect to granting preliminary

-12-
12

relief." Centro Medico del Turabo, 900 F.2d at 454 (quoting

Universidad Interamericana de Puerto Rico, 722 F.2d at 958).

Thus, the district court must apply the familiar, four-part

test for granting preliminary relief. Under this test, the

Board must demonstrate:

(1) A likelihood of success on the
merits;
(2) The potential for irreparable
injury in the absence of
relief;
(3) That such injury outweighs any
harm preliminary relief would
inflict on the defendant; and
(4) That preliminary relief is in the public
interest.

See, e.g., Narragansett Indian Tribe v. Guilbert, 934 F.2d 4,

5 (1st Cir. 1991); Centro Medico del Turabo, 900 F.2d at 453.

When, as in this case, the interim relief sought by the Board

"is essentially the final relief sought, the likelihood of

success should be strong." Pan American Grain Co., 805 F.2d

at 29 (emphasis added).

Our review of the district court's analysis is

limited. We review the court's determination of reasonable

cause for clear error, and we examine its ultimate decision

to grant or deny equitable relief for abuse of discretion.

Centro Medico del Turabo, 900 F.2d at 450; Pan American Grain

Co., 805 F.2d at 25. A court abuses its discretion when, in

determining the likelihood of success on the merits, it

applies an improper legal standard or erroneously applies the

-13-
13

law to particular facts. Feinstein v. Space Ventures, Inc.,

989 F.2d 49, 51 (1st Cir. 1993).

III.

Discussion

The Board argues on appeal that the district court

erred in concluding that the Board failed to demonstrate a

likelihood of success on the merits and that it abused its

discretion in denying its petition for injunctive relief. We

now address these arguments.

A. The District Court's Ruling

1) Reasonable Cause

The district court made no reasonable cause

finding, instead proceeding directly to assess the Board's

likelihood of success on the merits. Neither party argues

that this in itself constituted error; we assume arguendo

that the district court did in fact find reasonable cause,7

7. Perhaps the court saw no reason to labor over a test of
questionable utility; we are not unsympathetic. Even if a
court makes an explicit finding that the Board had reasonable
cause, it must still assess, as part of the "just and proper"
determination, the relative likelihood that the Board will in
fact ultimately prevail. See Centro Medico del Turabo, 900

F.2d at 455 ("[W]e are satisfied . . . that there is
reasonable cause to believe that the alleged unfair labor
practices were committed, and that there is substantial

likelihood of success") (emphasis added); Universidad

Interamericana de Puerto Rico, 722 F.2d at 959 (stating that

the reasonable cause determination consists of determining
"whether the Regional Director's position was fairly
supported and, if so, for the purpose of overall weighing,
how likely so") (emphasis added).

-14-
14

and turn to the district court's determination that the Board

failed to demonstrate a likelihood of success.

2) No Likelihood of Success

The gravamen of the Board's unfair labor practice

complaint is that the administrative transfer of Locals 109C

and 139B to Local 600M raised no question of representation.

In other words, the Board asserts that Local 600M took over

the representation of the Sullivan Brothers bookbinders and

pressmen from locals 139B and 109C with sufficient continuity

to keep intact Sullivan Brothers' obligations to recognize

and bargain with Local 600M and to perform under the existing

collective bargaining agreements. The district court

concluded that the Board had not demonstrated that it was

likely to win that argument. In so holding, the district

court relied primarily on (1) changes in leadership effected

by the transfer; (2) changes in a number of the rights and

Two circuits have recently dropped the reasonable
cause analysis in section 10(j) cases, reasoning that (1) it
was erroneously introduced in section 10(j) cases by analogy
to cases arising under section 10(l), which, unlike section
10(j), expressly requires that the Regional Director find
reasonable cause prior to seeking an injunction, and (2) it
is entirely superfluous, since determining that equitable
relief is appropriate necessarily includes a finding that the
Board is likely to succeed on the merits -- a virtual
impossibility without also meeting the minimal reasonable
cause standard. See Miller v. California Pacific Medical

Center, 19 F.3d 449, 456-67 (9th Cir. 1994) (en banc); Kinney

v. Pioneer Press, 881 F.2d 485, 487-93 (7th Cir. 1989). We

find no fault in our sister circuits' rulings. However, the
relative merits of retaining or discarding the reasonable
cause requirement were not argued in this case, and we
therefore decline to rule on the issue.

-15-
15

duties of the local members; and (3) changes in the manner of

negotiating, ratifying and administering contracts and

calling strikes. The Board argues that these changes were

non-existent, illusory, or insufficient to constitute a

change in the representative's identity, and that the

district court's conclusion was erroneous.

We cannot say that any single one of the changes

cited by the district court would result in a change of

identity for a union, or even that, taken together, all of

these changes will certainly result in an ultimate

determination for Sullivan Brothers. Our task here is simply

to determine whether the district court erred in finding

significance in these facts and whether it abused its

discretion in concluding that the Board had not demonstrated

a clear likelihood of success. Bearing in mind that "[t]he

ultimate question is whether the union . . . operates in

substantially the same way as it did before," Seattle-First

Nat'l Bank v.NLRB, 892 F.2d 792, 799 (9th Cir. 1989), cert.

denied, 496 U.S. 925 (1990), we think the district court

acted well within its discretion by declining to answer that

question in the affirmative.

To determine whether a particular affiliation,

merger, or transfer interrupts an existing collective

bargaining relationship, the Board asks: (1) whether the

merger or transfer vote occurred under "circumstances

-16-
16

satisfying minimum due process"8 and (2) whether there was

"substantial continuity" between the pre- and post-merger

union.9 Southwick Group d/b/a Toyota of Berkeley, 306

N.L.R.B. 893, 899 (1992) (quoting News/Sun-Sentinel Company,

290 N.L.R.B. 1171 (1988), enforced 890 F.2d 430 (D.C. Cir.

1989), cert. denied, 497 U.S. 1003 (1990)); see also

Insulfab, 789 F.2d at 965.

The "substantial continuity" prong is a fact-

intensive test that compares the pre- and post-merger labor

organizations and asks "whether the changes are so great that

a new organization has come into being -- one that should be

required to establish its status as a bargaining

representative through the same means that any labor

organization is required to use in the first instance."

Toyota of Berkeley, 306 N.L.R.B. at 900. No single factor is

determinative, nor is a particular checklist prescribed.

8. Sullivan Brothers apparently does not challenge the
procedures surrounding Local 109C's and Local 139B's transfer
votes in this proceeding, and we therefore offer no opinion
on whether those votes satisfied minimal due process
standards. See supra note 5.

9. Union affiliations and mergers do not necessarily, or
even usually, raise a question of representation. NLRB v.

Insulfab Plastics, Inc., 789 F.2d 961, 964 (1st Cir. 1986).

A question of representation arises when the affiliating
union undergoes changes "sufficiently dramatic to alter the
union's identity." Id. at 964-65. Otherwise, affiliation

"is an internal union matter that does not affect the
representative status of the bargaining agent or end the
employer's duty to continue its relationship with that
union." Id. at 965.

-17-
17

Rather, "[t]he Board considers the totality of a situation."

Id. Among the factors that the Board has traditionally

considered are: "the continued leadership responsibilities

of existing union officials, the perpetuation of membership

rights and duties, the continuance of the manner in which

contract negotiations, administration, and grievance

processing are effectuated, and the preservation of the

certified representative's assets, books and physical

facilities." Id. See also Insulfab, 789 F.2d at 965

(listing as factors to consider "structure, administration,

officers, assets, membership, autonomy, by-laws, size"

(quoting NLRB v. Pearl Bookbinding, 517 F.2d 1108, 1111-12

(1st Cir. 1975)); J. Ray McDermott & Co. v. NLRB, 571 F.2d

850, 857 (5th Cir.) ("we must consider whether changes have

occurred in the rights and obligations of the union's

leadership and membership, and in the relationships between

the putative bargaining agent, its affiliate, and the

employer"), cert. denied, 439 U.S. 893 (1978).

The Board argues that the district court erred in

performing the substantial continuity analysis by

exaggerating and overemphasizing changes in leadership while

ignoring other evidence of continuity. We recognize that

"there is no requirement that officers of a merged local must

become officers of the new local," Service America Corp., 307

N.L.R.B. 57, 60 (1992) (emphasis added), and that continued

-18-
18

leadership may be provided by representatives other than

union officers if they fill positions of responsibility and

trust. As evidence of continuity of leadership, the Board

points to the continuation of Wysocki in his role as shop

steward, former Local 139B president Becht's tentative

commitment to participate in future negotiations, and former

Local 109C president Boermeester's election to Local 600M's

executive board and his continued participation in contract

administration and negotiation.

The evidence, however, supports a finding that the

transfer did in fact change the relationship between the

putative bargaining agent and Sullivan Brothers. Becht's

tentative commitment remained just that, and Boermeester

failed to obtain as a condition of the transfer an express

guarantee that he would oversee day-to-day contract

administration and future negotiations with Sullivan

Brothers. Moreover, Boermeester's term on the executive

board expires at the end of 1994, when he must face

reelection before the entire local. Furthermore, Local 600M

president Carlsen notified Sullivan Brothers in writing

following the transfers that henceforth it would be his

office that would handle contract administration,

negotiations, and grievances, and that future communications

concerning those matters should be directed accordingly.

Compare Toyota of Berkeley, 306 N.L.R.B. at 904 (finding

-19-
19

substantial continuity following merger where, inter alia,

former union's principal official, as a condition of the

merger, "continued to exercise sole control over the

collective bargaining and day-to-day contract administration

and grievance handling on behalf of employees formerly

represented by [the merged] Local").

In arguing that there was in fact continuity of

leadership, the Board relies heavily on Service America. We

fail to see how that case controls here. In Service America,

the Board held that having new representatives negotiate and

administer contracts following a merger does not necessarily

defeat continuity, particularly when the former union would

have undergone a change in leadership anyway. Service

America, 307 N.L.R.B. at 60. The circumstances in that case

were entirely different, however, from the case at hand.

First, the merging union in that case, Local 513, still had

1,300 members and a full slate of its own local leaders when

it merged with Local 115. Here, the evidence is undisputed

that no members of Local 139B or 109C wished to take over

positions of leadership within their own locals; the transfer

occurred in part precisely because the workers had no more

leaders and no prospects of finding any among the ranks --

i.e., they had no more representation. Second, in Service

America, both of Local 513's top officials also served as

business agents negotiating contracts and handling grievances

-20-
20

for the union; they continued as full-time business agents,

negotiating contracts and handling grievances, for Local 115.

No former 109C or 139B officer has retained a similar

position of responsibility as part of Local 600M. Wysocki's

continued stewardship and Boermeester's position on Local

600M's executive board represent some continuity of

leadership for their former local; whether they represent

substantial continuity is doubtful. Our attention has not

been directed to any case in which the Board ultimately found

substantial continuity when the affiliating or merging union

has undergone the kind of transformation of leadership seen

here. See Garlock Equip. Co., 288 N.L.R.B. 247-253 (1988)

("[T]he cases have placed emphasis upon whether unit

employees have continued to be represented by the same

officers operating under the same procedures and with the

same degree of autonomy as before the change.").

A host of other factors further distinguishes this

case from Service America. In that case, the dues structure

remained virtually identical following the merger, contract

ratification and strike vote procedures were similar, and

some of Local 513's assets were retained for the benefit of

its members. Here, the district court found significant a

number of changes in the structure of the union, in the

bookbinders' and pressmen's rights and duties as members, and

-21-
21

in the procedures for contract negotiation, ratification and

strike votes.10

The Board contends that the district court erred in

assigning importance to these changes -- particularly those

concerning contract ratification and strike votes, which may

be apparent in Local 600M's by-laws but might never be put

into practice. We recognize that actual union practice, and

not just the letter of the by-laws, controls. Central

Washington Hosp., 303 N.L.R.B. 404, 405 (1991); Seattle-First

Nat'l Bank, 892 F.2d at 799. In both of those cases,

however, there was testimony that union practice was actually

contrary to the by-laws in question. Here, Carlsen testified

that Local 600M's by-laws in fact permit the executive board

to accept a contract against the wishes of the majority of a

bargaining unit's members. The record contains no evidence

that that particular provision, or any other provision in

question, does not represent the actual practice of Local

600M.

As we have stated previously, interim relief in

section 10(j) cases is not normally appropriate unless it is

clear that ultimate success for the Board will "not prove

10. For a more complete description of these changes, see
supra part I.B. The district court made no finding regarding

the preservation of former Local 109C's and 139B's assets.
The evidence was undisputed, however, that the assets were
not preserved for the use of the former members but instead
were or would be added to Local 600M's general or emergency
funds.

-22-
22

difficult." Pan American Grain Co., 805 F.2d at 29. From

our perspective, however, the transfer of locals 139B and

109C to 600M exhibited no combination of characteristics on

which the Board has typically based a finding of continuity

in the past. Cf., e.g., Service America, 307 N.L.R.B. 57

(1992) (finding continuity where merger resulted in positions

of significant responsibility for former leaders, virtually

identical rights, responsibilities and dues for members, and

preservation of certain assets for benefit of former

members); Toyota of Berkeley, 306 N.L.R.B. 893 (1992)

(finding continuity where former local was merged into sister

local as separate, autonomous division with same trade and

geographic jurisdiction; identical principal official and

bargaining agent; identical authority of bargaining agent and

members to negotiate and administer contracts, fashion

bargaining proposals, and call strikes; virtually identical

dues structure; and where by-laws of sister local were

amended as a condition of the merger); May Dep't Stores Co.,

289 N.L.R.B. 661 (1988) (finding continuity where leadership,

authority, dues, and rights and duties of members remained

intact following merger of four locals into one local with

four administrative districts), aff'd, 897 F.2d 221 (7th

Cir.), cert. denied, 498 U.S. 895 (1990). Without some Board

precedent finding continuity where the changes at least

approach those seen here, we cannot say that the district

-23-
23

court incorrectly applied the law in concluding that the

Board had not shown a likelihood of success.

The district court did not analyze the Board's

petition under the remaining three requirements for

injunctive relief, and we see no need to engage in that

exercise here. Without a clear likelihood of success,

injunctive relief would not have been just and proper. See

Weaver v. Henderson, 984 F.2d 11,12 (1st Cir. 1993) ("The

sine qua non of [the injunctive relief analysis] is whether

the plaintiffs are likely to succeed on the merits."); see

also Pan American Grain Co., 805 F.2d at 28 (stating that for

an injunction to issue, the record must support a finding of

a likelihood of success on the merits). Thus, the district

court's denial of injunctive relief was not an abuse of

discretion.

AFFIRMED.

-24-
24