SULLIVAN BROTHERS PRINTERS,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

LOCAL 600M, GRAPHIC COMMUNICA-
TION INTERNATIONAL UNION,
AFL–CIO, CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Sullivan Brothers Printers,
Inc., Intervenor.

Nos. 95–1733, 96–1098.

United States Court of Appeals,
First Circuit.

Heard June 7, 1996.

Decided Nov. 5, 1996.

Robert P. Corcoran, Boston, MA, with whom Gleeson & Corcoran was on brief, for petitioner Sullivan Brothers Printers, Inc.

Anton G. Hajjar, Washington DC, Adrienne L. Saldaña, New York City, and O'Donnell, Schwartz & Anderson, P.C. on brief for petitioners Local 600M, Graphic Communications International Union, AFL–CIO, CLC and Graphic Communications International Union, AFL–CIO, CLC.

David A. Fleischer, Senior Attorney, with whom Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel and Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board were on brief for the National Labor Relations Board.

Before.TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

TORRUELLA, Chief Judge.

Petitioner–Appellant Sullivan Brothers Printers, Inc. ("Sullivan"), appeals the decision of the National Labor Relations Board (the "NLRB" or the "Board") finding that Sullivan committed an unfair labor practice. Local 600M of the Graphic Communications International Union ("GCIU"), AFL–CIO, appeals the Board's refusal to order the remedy it requested. For the reasons stated herein, we affirm.

## BACKGROUND

We have previously addressed this dispute in some detail. *See Pye v. Sullivan Bros. Printers, Inc. ("Sullivan I")*, 38 F.3d 58 (1st Cir.1994) (affirming district court's denial of the Board's request for a preliminary injunction requiring that Sullivan recognize and bargain with Local 600M). Accordingly, rather than delve into the facts of this case, we begin with an outline of the dispute, and address more specific details as they arise.

For over three decades, GCIU Local 109C represented Sullivan's pressmen, and Local 139B represented its bookbinders. As of 1990, Sullivan's pressmen and bookbinders represented a small minority in each local: "The vast majority of the members of each local ... worked at another printing company, North American Directory Corporation ('NADCO')." *Id.* at 60. By 1993, however, NADCO had closed its plant, dramatically reducing the locals' membership. Local 109C was left with about 40 members, roughly 15 of whom were from Sullivan, and Local 139B with 8 to 10 members, all from Sullivan. Henry Boermeester ("Boermeester"), presi-

dent of Local 109C, and Oscar Becht ("Becht"), president of Local 139B, both NADCO employees, began to explore the possibilities of merging or transferring the locals. Accordingly, in January of 1993, the Local 109C members voted to surrender their charter and transfer to Local 600M, which had some 700 members. The Local 139B members did the same in March. *Id.* at 60–61.

In July of 1993, Local 600M formally notified Sullivan of the changes and asked Sullivan to recognize and bargain with it. Local 139B's contract with Sullivan was due to expire in August of 1993, but Local 109C's was effective through May of 1995. Beginning in July, 1993, Sullivan began to take unilateral actions, which Local 600M points to as unlawfully altering some of the terms and conditions of employment in the bookbinders' and pressmen's units. Sullivan informed Local 600M in early August, 1993, that it would not recognize Local 600M, and that it did not consider itself bound by the transfer. *Id.* at 62.

Local 600M responded by filing an unfair labor practice charge with the Board. The Board issued an unfair labor practice complaint charging Sullivan with violations of the National Labor Relations Act (the "Act") for refusing to bargain and for unilaterally changing the terms and conditions of employment, in violation of sections 8(a)(1) and 8(a)(5) of the Act. *See* 29 U.S.C. §§ 158(a)(1) & (a)(5).[1] The Board petitioned the district court for a temporary injunction requiring that Sullivan recognize and bargain with Local 600M and rescinding certain of the unilateral changes. The district court denied the injunction, stating that " 'a question exist[ed] as to the continuity of representation provid-

---

1. Under § 8(a) of the Act,
 [i]t shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 \* \* \* \* \* \*

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 29 U.S.C. §§ 158(a)(1) & (a)(5).

ed by Local 600M,'" *id.* at 62, and a panel of this court affirmed ·in October, 1994.[2] *Id.*

In the meantime,. an administrative law judge ("ALJ") conducted a hearing and issued his decision in July, 1994. The ALJ found that Sullivan had not violated the Act by refusing to recognize Local 600M as the successor to 139B, but had violated it by refusing to recognize Local 109C. The NLRB, in turn, found that Sullivan had violated the Act by refusing to recognize Local 600M as the successor to both Locals, and ordered Sullivan to recognize and bargain with Local 600M. *Sullivan Bros. Printers, Inc. ("Sullivan II")*, 317 N.L.R.B. 561, 1995 WL 318651 (1995). Sullivan petitioned for review, this court granted the Board's motion to transfer the proceeding to the United States Court of Appeals for the District of Columbia Circuit, and that Circuit transferred the proceeding back to this court. The Board has filed a cross-application for enforcement of its order.

## DISCUSSION

### I. *Sullivan*

Sullivan contends that we should set aside the Board's order. At heart, its argument is that the administrative transfer of Locals 139B and 109C interrupted the collective bargaining relationship, giving rise to a question of representation, such that Local 600M must establish its status as a bargaining representative through the same means that any labor organization must use in the first instance. *See NLRB v. Insulfab Plastics, Inc.*, 789 F.2d 961, 964–65 (1st Cir.1986).

■ "The Act recognizes that employee support for a certified bargaining representative may be eroded by changed circumstances," *NLRB v. Financial Inst. Employees of America, Local 1182 (Seattle–First Nat'l Bank)*, 475 U.S. 192, 197, 106 S.Ct. 1007, 1010, 89 L.Ed.2d 151 (1986), such as the administrative transfer here. In order to

determine whether a particular change "interrupts an existing collective bargaining relationship, the Board asks: (1) whether the merger or transfer vote occurred under 'circumstances satisfying minimum due process' and (2) whether there was 'substantial continuity' between the pre- and post-merger union." *Sullivan I*, 38 F.3d at 64 (quoting *Southwick Group d/b/a Toyota of Berkeley*, 306 N.L.R.B. 893, 899, 1992 WL 68668 (1992) (quoting *News/Sun–Sentinel Co.*, 290 N.L.R.B. 1171, 1988 WL 404708 (1988), enforced 890 F.2d 430 (D.C.Cir.1989), cert. denied, 497 U.S. 1003, 110 S.Ct. 3238, 111 L.Ed.2d 748 (1990)), *vacated in part, In the Matter of Nancy Watson–Tansey*, 313 N.L.R.B. 628, 1994 WL 35076 (1994)) (additional citations omitted).

■ "Whether a question of representation exists is a factual issue to be determined by the Board." *Minn–Dak Farmers Coop. v. NLRB*, 32 F.3d 390, 393 (8th Cir.1994). "We will enforce a Board order if the Board correctly applied the law and if substantial evidence on the record supports the Board's factual findings." *Union Builders, Inc. v. NLRB*, 68 F.3d 520, 522 (1st Cir.1995). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 22 (1st Cir.) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)), cert. denied, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). We begin our analysis with Sullivan's challenge to the Board's finding of due process, and then turn to the issue of whether substantial continuity existed here.

### A. *Due Process* ·

■ Sullivan contends that the Board erred in overruling the ALJ's determination and finding that the voting procedures em-

2. In *Sullivan I*, we concluded that "the transfer of [L]ocals 139B and 109C to 600M exhibited no combination of characteristics on which the Board has typically based a finding of continuity in the past." *Sullivan I*, 38 F.3d at 67. We recognize that our holding today affirming the Board's decision reaches a different conclusion than in our earlier decision. In that case we

were reviewing an interlocutory appeal for a temporary injunction pursuant to section 10(j) of the Act. *See* 29 U.S.C. § 160(j). Such a proceeding is independent of the proceeding on the merits, and therefore our decision in *Sullivan I* is not binding in the context of this appeal. *See NLRB v. Kentucky May Coal Co.*, 89 F.3d 1235, 1239–40 (6th Cir.1996) (collecting cases).

ployed by Local 139B in electing to surrender their charter and transfer to Local 600M satisfied minimal due process standards.[3] It is established that the balloting procedures a union follows need not conform to Board standards. *See Seattle–First,* 475 U.S. at 204, 106 S.Ct. at 1014. Generally, the Board will look for such due process safeguards as "notice of the election to all members, an adequate opportunity for members to discuss the election, and reasonable precautions to maintain ballot secrecy." *Id.* at 199, 106 S.Ct. at 1011. The burden of establishing lack of adequate due process lies with Sullivan. *See News/Sun Sentinel Co. v. NLRB,* 890 F.2d 430, 433 n. 4. For the reasons set forth below, we find it has not met that burden.[4]

Here, on the day of the vote, Becht, the president of Local 139B, passed out ballots to the five or six employees on the day shift, leaving three or four additional ballots with another employee for distribution to the employees on the night shift. He informed them that he would return the following day to pick up the ballots, which were collected in an envelope. When he collected the sealed envelope, he found eight ballots, all cast in favor of the merger. No objection was raised by the members as to the merger vote process.

The Board concluded that the due process requirement was met in this case. First, it found that Becht held four or five informal meetings with the remaining Local 139B members after the NADCO closure, informing them of the status of negotiations, and notified them a week before the vote that he would bring around the ballots, a procedure consistent with his established practice. Second, as for the vote itself, the Board relied on the lack of any evidence that the election was not in fact accomplished with adequate procedural safeguards, noting that Becht knew that all of the employees were current union

members, that he personally distributed the ballots to the day-shift employees, and that there was no evidence that the ballots' secrecy was compromised. Third, the Board noted that, "[m]ost important[ly], there [was] no indication that any individual objected to the voting procedures or any aspect of merger. either at the time of the vote or any time subsequently, or that the vote did not reflect the majority view." *Sullivan II,* 317 N.L.R.B. at 563, 1995 WL 318651 at *4. Accordingly, the Board concluded that its standard of minimal due process was satisfied, emphasizing again "that this case involves the merger of sister locals and that no one objected." *Id.*

The Board accepted Becht's testimony about the union membership status of Sullivan's employees. In so doing, the Board stated that, unlike the Board, the ALJ had "questioned the basis for Becht's knowledge concerning the union membership status of the Respondent's unit employees as being 'without foundation.'" *Id.* 1995 WL 318651 at *9 n. 4. According to the Board, its acceptance of Becht's testimony about union membership therefore ran contrary to the ALJ's conclusion. Sullivan argues that the Board erred in drawing this conclusion. Instead, Sullivan contends, when the ALJ discussed the foundations of Becht's testimony he was in fact concerned with another issue: Becht's testimony about his "'belief' that someone referred to only as 'he' just handed the ballots out without checking names off at night and that the 'individual' who passed them out at night was responsible to collect them." *Sullivan II,* 317 N.L.R.B. at 570, 1995 WL 318651 at *15. This purported error proves a red herring. Contrary to Sullivan's position, the ALJ did comment on the lack of foundation for Becht's statement that the employees who voted were all union members, stating that "[h]ow he knew this is unexplained." *Id.* Thus the Board's state-

---

**3.** Sullivan does not challenge the Board's adoption of the ALJ's finding that the election carried out by Local 109C did not violate the minimal due process requirement.

**4.** Local 600M and the GCIU, as joint intervenors, raise the issue of whether the imposition of voting requirements is beyond the Board's statutory power. *See Seattle–First,* 475 U.S. at 199 n. 6,

106 S.Ct. at 1011 n. 6 (declining to reach the issue). Like the Board before us, however, we need not address whether the NLRB has the authority to impose due process requirements, as such requirements have at any rate been met here. *See Sullivan II,* 317 N.L.R.B. at 562, 1995 WL 318651 at *9 n.2.

ment was not inaccurate. What is more, even if it were a misstatement, Sullivan has pointed to no grounds for us to question the Board's acceptance of "the veteran Local 139B officer's uncontroverted testimony." *Id.* 1995 WL 318651 at *9 n. 4.

Second, Sullivan questions the Board's reliance on the fact that when Becht retrieved the ballots they were in the sealed envelope, with no evidence that they had been tampered with or their secrecy compromised. Sullivan argues that the ALJ's reasoning was more persuasive when he stated:

> [a]lso left devoid of any informative answers are significant questions of who had custody of the envelope from the time it was delivered to employees and then returned to Becht at noon the following day, if anyone; where it was kept, and whether any safeguards whatsoever reasonably protected the secrecy and reliability of the ballots during the course of the day and a half consumed before Becht arrived and the ballots were tallied.

*Id.* at *15. Sullivan maintains that the ALJ's concerns were more probative as to the secrecy and integrity of the balloting than whether or not the ballots were in a sealed envelope. We disagree. Simply put, the burden is on Sullivan to prove impropriety, and mere assertions that tampering was possible, without evidentiary support in the record, does not meet that requirement. *See News/Sun Sentinel Co.,* 890 F.2d at 433–34 ("[A]n employer challenging the validity of a merger election must provide an evidentiary showing of irregularity before the burden can shift to the NLRB General Counsel to provide affirmative proof of procedural propriety."). We cannot find that the Board applied the law incorrectly where Sullivan does not meet its burden. *Cf. Insulfab,* 789 F.2d at 965–66 (upholding near unanimous election in 32–person union despite informal procedures).

Third, Sullivan questions the Board's reliance on the fact that none of the employees objected to the voting procedure, arguing that even minimal due process standards require the use of a "more finely calibrated analysis than whether or not someone bothered to complain." Appellant's Brief, at 47.

Indeed, Sullivan continues, that is especially so here, because prior to the merger no Local 139B member showed an interest in becoming active in the union, indicating that the lack of objection is just as likely to indicate apathy as approval. We are once again unconvinced. The Board did not rely solely on the fact that no employee objected: it also found that the employees were given a week's notice of the election, that they held four or five meetings to discuss the change, and that there was no evidence that the ballots were tampered with. While it is not dispositive, the fact that none of the eight employees who voted complained supports the Board's finding. *See, e.g., Insulfab,* 789 F.2d 961, 966 (1st Cir.1986) (noting that no one in the bargaining unit opposed the results of an affiliation election in upholding the Board's finding of due process); *Aurelia Osborn Fox Memorial Hosp.,* 247 N.L.R.B. 356, 1980 WL 11045, at *5 (1980) (same).

### B. *Substantial Continuity*

■ Having established that Local 139B's voting procedure did not violate due process, we turn now to the substantial continuity prong of the test. The focus in this second step is on whether the administrative transfer "substantially changed the union." *Seattle–First,* 475 U.S. at 199, 106 S.Ct. at 1011. In making its factual determination, the Board traditionally considers a number of factors, including the union's "structure, administration, officers, assets, membership, autonomy, by–laws, [and] size," *NLRB v. Pearl Bookbinding Co.,* 517 F.2d 1108, 1111 (1st Cir.1975), as well as any changes " 'in the rights and obligations of the union's leadership and membership, and in the relationships between the putative bargaining agent, its affiliate, and the employer,' " *Insulfab,* 789 F.2d at 966 (quoting *J. Ray McDermott & Co. v. NLRB,* 571 F.2d 850, 857 (5th Cir.), *cert. denied,* 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978)). Nonetheless, "[i]n assessing continuity, the NLRB does not run down a checklist of 'certain cited criteria'; instead, the Board considers 'the totality of a situation.' " *News/Sun Sentinel Co.,* 890 F.2d at 432 (quoting *Yates Indus., Inc.,* 264 N.L.R.B. 1237, 1250, 1982 WL 23794 (1982)).

The burden is again on Sullivan to prove lack of continuity. *News/Sun Sentinel Co.*, 890 F.2d at 432.

Sullivan argues that the Board incorrectly applied the law and relied upon findings of fact not supported by substantial evidence in holding that substantial continuity exists between Locals 139B and 109C and Local 600M. We turn now to the merits of this claim.

### 1. Leadership Responsibility

*Local 139B:* No former Local 139B official holds an elected or appointed position in Local 600M. The Board found that the only remaining Local 139B officers, President Becht and Jeannette Pickels, were both offered and declined positions with Local 600M after the merger. The Board also found that Becht agreed to serve on Local 600M's negotiating committee, a role he played prior to the merger. The Board noted that negotiations would be accomplished by the union's president, who was not a Sullivan employee, as was true in the past. Thus, according to the Board, the lack of continuity in leadership was caused by the free choice of the leaders themselves, and there was some continuity in the form of Becht's participation on the negotiating committee.

We find that the Board's conclusion regarding Becht's role is not supported by substantial evidence. Both Becht and the president of Local 600M testified that Becht had agreed that "if he was available, he'd be delighted to be there, but he couldn't commit." (Transcript of hearing before NLRB, Feb. 3, 1994, p. 265). Thus, the commitment to serve on the negotiating committee was tentative at best, and not the agreement the Board describes. *See Sullivan I*, 38 F.3d at 65. Accordingly, the Board's conclusion that Becht "will continue to perform the same leadership role with respect to the [Local 600M's] negotiations with Respondent," *Sullivan II*, 317 N.L.R.B. at 564, 1995 WL 318651 at *5, is also without a foundation in substantial evidence. Becht's tentative role in the negotiation process, paired with the fact that no Local 139B officer has an official position in Local 600M, precludes finding

substantial continuity in leadership. *See Garlock Equip. Co.*, 288 N.L.R.B. 247, 1988 WL 213720, at *11 (1988) (viewing continuity of leadership as a function of whether the unit's employees continue to be represented by the same officers, who are operating under procedures and with a degree of autonomy similar to that which they had earlier).

Whether a union "[r]etain[s] the same key personnel is important, for '[w]hen the same persons participate in communications with the company with respect to grievances, contract negotiations, and the like, continuity is likely to be preserved.'" *Insulfab*, 789 F.2d at 966 (quoting *St. Vincent Hosp. v. NLRB*, 621 F.2d 1054, 1057 (10th Cir.1980)). Nonetheless, our conclusion that there was no continuity of leadership between Local 139B and Local 600M does not end our analysis, as "'there is no requirement that officers of a merged local must become officers of the new local.'" *Sullivan I*, 38 F.3d at 65 (quoting *Service Am. Corp.*, 307 N.L.R.B. 57, 60, 1992 WL 77803 at *5 (1992)). The Board weighs the totality of the evidence, *see, e.g., Central Wash. Hosp.*, 303 N.L.R.B. 404, 404, 1991 WL 113265 at *1 (1991), *enforced sub nom. NLRB v. Universal Health Sys.*, 967 F.2d 589 (9th Cir.1992), and, as it commented here, the situation regarding continuity of the Local 139B leadership is "somewhat unusual," *Sullivan II*, 317 N.L.R.B. at 563, 1995 WL 318651 at *5, because leadership positions were in fact offered to Becht and Pickels, who declined them. Thus the lack of continuity is not due to Local 600M itself—in fact, the lack of leadership was a driving force behind the administrative transfer. *See Seattle–First Nat'l Bank*, 290 N.L.R.B. 571, 572, 1988 WL 213911 at *3 (1988) (noting, *inter alia*, that there was no evidence that replacement of officers was a condition of affiliation or result of action by the International union in finding substantial continuity despite turnover in officers), *enforced* 892 F.2d 792 (9th Cir. 1989), *cert. denied*, 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990).

*Local 109C:* The Board adopted the ALJ's finding that there was continued leadership responsibility on the part of Local

109C officials. The ALJ noted that the former president of Local 109C, Boermeester,

> became an elected executive board member [of Local 600M] on August 5, 1993, and represented the former Local 109C members employed by Respondent in the dispute over Respondent's unilateral changes in a 401(k) plan in a letter sent in his official Local 600M capacity on September 28, 1993, as well as demanding bargaining over new equipment purchased by Respondent. His long-time practice of regular contact with chapel chairmen continued, with regular contacts between [Chapel Chairman Stephen] Wysocki and him over representation of Respondent's employees and Local 600M President Carlsen testified credibly that the Local denoted him for membership on the negotiating committee from Local 600M when it negotiates with Respondent. He represented Local 600M in other negotiations with employers whose employees Local 109C previously represented....

*Sullivan II*, 317 N.L.R.B. at 572, 1995 WL 318651 at *18 (citation omitted). The ALJ also noted that Chapel Chairman Wysocki retained the same leadership role that he had prior to the merger, and that the president of Local 600M testified that Wysocki will be used as a negotiating committee member in contract negotiations with Sullivan. Finally, it found that two chapel chairmen at another former Local 109C employer will continue in their positions under Local 600M.

Sullivan contests the ALJ's conclusion. First, it points out that Boermeester was the only former Local 109C official to hold any of the elected or appointed positions within Local 600M—indeed, Sullivan maintains, he was the only former official who even became a member of Local 600M.[5] Sullivan also relies on the testimony that Boermeester's appointment was not a condition of the merger, that it was not made until the merger was complete, that Boermeester would have to win an election to retain his position, as it was a temporary one to fill an unexpired term, and that Boermeester represented a division that

did not contain former Local 109C members. Sullivan adds that Boermeester testified that he agreed to participate in future negotiations only if he had time to, and that, like Becht, even in those negotiations in which he participated, he would not enjoy the same degree of autonomy and authority as he had previously. *See Sullivan I*, 38 F.3d at 66. Therefore, Sullivan concludes, Boermeester's role cannot be found to satisfy the continued leadership responsibility requirement.

We found in *Sullivan I* that "Wysocki's continued stewardship and Boermeester's position on Local 600M's executive board represent some continuity of leadership for their former local; whether they represent substantial continuity is doubtful." 38 F.3d at 66. Our standard of review here is fairly deferential to the Board's decision, while in *Sullivan I* it was the district court that received our deference. *See id.* at 63 (noting that we reviewed the court's determination of reasonable cause for clear error, and the decision to deny equitable relief for abuse of discretion). The standard makes all the difference here: applying the pertinent standard, we must affirm the Board's finding that there was continuity of leadership between Local 109C and Local 600M, notwithstanding Sullivan's argument. *Cf. City Wide Insulation, Inc.*, 307 N.L.R.B. 1, 2, 1992 WL 75108 at *3 (1992) (finding substantial continuity of leadership despite fact that business manager who formerly did not report to anyone was required to report to secretary-treasurer of new district council and union counsel was added to negotiating team). The evidence Sullivan points to would allow a factfinder to reach conclusions differing from the Board's—as we intimated in *Sullivan I*—but our review of the record reveals substantial evidence underpinning the ALJ findings adopted by the Board regarding Local 109C. We will not substitute our judgment for the Board's, even if we might have reached a different conclusion, *see Union Builders*, 68 F.3d at 522, and so we must affirm the Board's finding in these circumstances.

---

5. Both Boermeester and Wysocki testified that no one in Local 109C wanted to take over running the local.

## 2. Negotiation and Administration of Contracts

### *Proposals*

 In terms of contract proposals, the practice of both Local 109C and Local 139B was to hold informal meetings—at a donut shop or on the shop floor—where members could make proposals. The by-laws of Local 600M, however, state that suggested contract proposals must be submitted to the president, in writing, at least 90 days prior to contract expiration. We agree with Sullivan that, on its face, this is a substantial change. Nonetheless, the case law is firm that what we must weigh is not the rule, but the actual practice followed. *See, e.g., Central Wash. Hosp.*, 303 N.L.R.B. at 404, 1991 WL 113265 at *1. Carlsen testified that the by-laws procedure was not always strictly followed: sometimes Local 600M would hold meetings for proposals, and sometimes employees would send lists that were developed and sent back to them for approval or modification. On this record, the Board concluded that the procedure did not differ dramatically, despite the by-laws provision.

Sullivan protests that there was no evidence that the 90 day requirement was not adhered to. But Sullivan bears the burden here of demonstrating that there was no substantial continuity, and it points to nothing in the record demonstrating that the 90-day practice *was* adhered to, or how far ahead of time the Local 109C and 139B meetings were held. In the end, we are left with evidence that the old locals held meetings sometime prior to the contract's expiration to collect suggestions, and that Local 600M's practice is to sometimes hold meetings at a point prior to expiration, and sometimes to consider lists mailed in. On this record, we find that Sullivan has not met its burden and that we must affirm the Board's finding on this point.

### *Contract Negotiations*

 In negotiating contracts with Sullivan, the practice of Local 139B was for the president and a Sullivan employee to act as the negotiators; most recently, that had been Becht with an employee. According to Carlsen's testimony, Local 600M's practice would be to use a committee formed of the local's president, plus Becht as the former president, Wysocki (because there was no chapel chair from former Local 139B), and an employee, if possible. For Local 109C, the past practice was to use the local's president, vice president, and a chapel chair: only the latter was a Sullivan employee. Again according to Carlsen, the new practice would be to have himself as the president, Boermeester as the former president, Wysocki as chapel chair, and perhaps an employee, serve on the committee.

Sullivan argues that there is no substantial continuity here, as the primary responsibility for negotiations have shifted from Becht (who will not necessarily even serve) and Boermeester to Carlsen. Nonetheless, we agree with the Board that there has been no substantial break in continuity. First, neither Boermeester nor Becht were Sullivan employees to begin with, and so both before and after the administrative transfer Sullivan's employees will be represented by a team led by a non–employee president. Second, on both the pre- and post–transfer committees, the Sullivan employees do not make up a majority. Prior to the transfer, employees made up half of the 139B committee, and one third of the 109C committee: assuming Carlsen can find employees to fill his designated spots, they will make up one half of both committees. Based on this record, we find that substantial evidence supports the Board's factual finding of substantial continuity in contract negotiations.

Local 600M attempted to extend the bindery contract so that the contracts of both Locals 139B and 109C would expire on the same date, allowing Local 600M to break the established practice of negotiating the contracts individually and bargain for both at one time. Sullivan contends that this would result in a loss of autonomy for the locals, and so contests the Board's conclusion that the attempt did not mark a significant change in negotiation of contracts. The Board based its finding on Carlsen's testimony that he would be willing to conduct separate negotiations if the employees so wished. Without citing support, Sullivan maintains that the very fact that joint negotiations were

proposed reveals the lack of substantial continuity present. To the contrary, we find that Carlsen's flexibility on conducting separate negotiations indicates that Local 600M was willing to compromise in order to maintain the continuity of representation: to find otherwise would be to penalize the new local merely for suggesting changes that may, in fact, benefit workers. We have no reason to second-guess the Board's reliance on Carlsen's testimony, and accordingly affirm its findings on this point.

### Contract Ratification

■ The Board found that the contract ratification procedures remains substantially the same. Prior to the merger, in both locals a proposed contract was ratified only when accepted by a majority of the bargaining unit employees voting in a secret ballot election. The Board found, and Sullivan does not seem to contest, that Local 600M's practice of having only covered employees vote, by secret ballot if requested, is a substantially similar practice.

Sullivan focuses instead on the fact that, under Local 600M, the executive board has the right to accept contracts contrary to the membership's vote, thereby opening up the danger of the executive board accepting a contract and imposing it on the bargaining unit employees even though a majority of those employees voted to reject the contract. The Board did not find the change substantial, on the basis that

> this procedure takes effect only in a very limited situation, i.e., where a unit rejects a contract offer, votes not to strike, and does not accept the executive committee's recommendation. Under these limited circumstances, such a difference does not rise to the level of a significant change.

*Sullivan II,* 317 N.L.R.B. at 564, 1995 WL 318651 at *6. On appeal, the Board reiterates its logic that the executive board can only disregard the employees' wishes when they have brought the bargaining to a gridlock, an unlikely occurrence. Sullivan retorts that employees will frequently reject a contract offer but decide not to strike, and that even if the use of the power is rare, the dramatic change from the old locals' complete autonomy and the lasting consequences on the employees of the use of the executive board's power, represents a meaningful diminution of local autonomy and indicates a lack of continuity. *See National Posters, Inc.,* 289 N.L.R.B. 468, 479, 1988 WL 213801, at *20 (1988) ("If ... the members of the Local possessed the authority before the merger, but did not thereafter, to finally consummate their own bargaining agreements, a question of continuity of identity would be raised."), *enforced* 885 F.2d 175 (4th Cir.1989), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990).

We disagree. The case law Sullivan relies on for support involve a veto power that is invoked in every situation, unlike here. *See, e.g., Garlock Equip. Co.,* 288 N.L.R.B. at 254, 1988 WL 213720 at *13 (finding lack of continuity where, *inter alia,* representative of new district lodge must consent to every contract, creating a de facto veto). We are more persuaded by the Board's reasoning in *Seattle–First,* 290 N.L.R.B. at 573, 1988 WL 213911 at *4. There, as here, the former practice required ratification of a new contract by the membership, but after merger the new executive council could accept or reject a final contract offer without membership approval. The Board found that, as the executive council's authority was limited to occasions where the membership had rejected a strike or other economic action, as here, the membership did in fact "have the opportunity to voice its approval or disapproval of a final offer and the executive council cannot bypass the membership." *Id.* We accordingly affirm the Board's finding on this issue.

### Grievances

■ The ALJ found, without comment, that the grievance handling procedures for Local 600M were the same as for Local 109C. The Board adopted that finding, and concluded that, for Local 139B, the limited evidence before it demonstrated no significant difference in grievance handling procedures. Both before and after the transfer, the president of the Local would have the authority to resolve grievances once attempts to solve the problem informally at the shop level were unsuccessful.

Sullivan challenges these findings on two bases. First, Sullivan notes day–to–day administration had formerly been the responsibility of a Lowell–area union official, and now the administration would be undertaken by Boston-area President Carlsen. As the administration was never under the control of a Sullivan employee, we fail to see how this change in personnel amounts to a significant change, where the actual practice is the same. Second, Sullivan argues that neither of the former locals transferred its past contracts, arbitration decisions, contract proposals, or grievance resolutions, effectively undermining the preservation of continuity in contract administration. We agree with the Board that, as any informal settlement of a grievance has no precedential value, this is not a point of great significance. Indeed, Sullivan offers no evidence that Local 600M could not, in fact, access such records if a need arises. Finally, Sullivan focuses on the fact that, under Local 139B, a grievance received the direct attention of President Becht, but under Local 600M, an unresolved grievance was to be handled by a pressroom steward, and concludes that Local 600M intended to systematically blur the line between the bindery and pressroom units. We disagree. Local 139B never had a chapel chairman, according to Becht's testimony, because he could not find anyone willing to do the job. In this situation, we agree with the Board that the use of another Sullivan employee who is from the former Local 109C instead of from Local 139B does not mark a substantial difference.

### Strike Votes

With respect to strike votes, the Board found, and we agree, that the basic procedures of the locals are substantially similar. Sullivan's argument to the contrary is based on a Local 600M by–laws provision, which allows the executive board to call a strike in shops with 25 or fewer members without holding any kind of a vote. Before doing so, the executive board must be satisfied that the membership and the International support the strike and that the strike would have no adverse effect on the Local. The Board discounted the danger of this provision, relying on Carlsen's testimony that the actual practice was to have the individual shop affected conduct a vote by secret ballot, with a two-thirds majority necessary to authorize a strike. Sullivan's position is that Carlsen's testimony regarding Local 600M's normal policy regarding strike votes would not apply here, because Sullivan's employees fall within the 25 or fewer exception to the rule. Sullivan points out that Carlsen never stated that the executive board did not have the right to order a strike in such a small shop, or that the executive board never did.

We find support for the Board's conclusion in the following testimony by Local 600M President Carlsen:

> JUDGE BERNARD:.... Are you testifying that in the respects we've just discussed, the strike fund, the binding nature of a strike vote by the Local 600M, these remaining shops, including Sullivan ..., the members there, ... have retained their autonomy?
>
> THE WITNESS: They have retained their autonomy as to the right to vote on a contract or take an individual strike, but the Local would support them if they voted to go on strike.
>
> If we vote to strike Sullivan Brothers, Sullivan Brothers would also have the facilities of the merged fund.
>
> JUDGE BERNARD: Getting down to the bottom line just numbers wise, these shops would not necessarily be able to be outvoted or outflooded by all the other shops in Local—
>
> THE WITNESS: No, sir, the other shops would have nothing to do with it....

(Hearing Testimony, at 223–24). As Sullivan noted, Carlsen never stated that the by–law in question would not be applied. However, Carlsen's statement that the Sullivan shops "retained their autonomy as to the right to ... take an individual strike" offers evidentiary support for the Board's conclusion that "there is, at most, a minimal difference between the two locals' premerger procedures and those of [Local 600M]." *Sullivan II,* 317 N.L.R.B. at 564, 1995 WL 318651 at *6. The burden is on Sullivan to show that there is a lack of substantial continuity between the locals: here, where the Board can point to

evidence that the by-law at issue is not enforced, Sullivan's failure to raise record evidence disproving that assertion requires that we affirm the Board's conclusion. *Cf. Seattle–First,* 290 N.L.R.B. at 573, 1988 WL 213911 at *5 n. 11 (holding that international's potential authority to impose trusteeship on a local for failure to obtain authorization to strike "does not defeat the conclusion that in most situations decisions to strike remain at the local level"). *But see Sullivan I,* 38 F.3d at 67 ("The record contains no evidence that that particular provision, or any other provision in question, does not represent the actual practice of Local 600M.").

### 3. Assets and Records

■ The Board found that Local 139B's assets were transferred to Local 600M and commingled with other funds, but that the evidence indicated that "the full resources of the [Local] are available to the former Local 139B unit." *Sullivan II,* 317 N.L.R.B. at 565, 1995 WL 318651 at *7. As for Local 109C, its assets were transferred into the Local 600M strike or emergency fund, with similar results. We agree with the Board that such commingling is not dispositive, and that "it would frustrate a purpose of the Act to find that employee expressions of desire to achieve [increased financial support] through affiliations and mergers automatically raised questions concerning representation." *Id.* Therefore, although there is a substantial difference in the locals' assets prior to and after the administrative transfer, like the Board we are not disposed to give that fact great weight.

### 4. Members' Rights and Duties
#### *Dues*

■ The Board found a "slight difference" in the dues structure for Local 139B: the transfer resulted in a change from a flat dues rate to a sliding scale, resulting in an overall increase. The ALJ found a similar increase for local 109C members, from $8.00 to $9.22. No initiation fees were charged to members of either local. Sullivan argues now that the change to a sliding scale system based on salary, plus the difference in the dues charged, amounts to a substantial

change. We find nothing in its argument or the case law it relies on, however, to convince us that the Board's findings were incorrect. *See Central Wash. Hospital,* 303 N.L.R.B. at 404, 1991 WL 113265 at *2 n.8 (finding no marked change in dues despite rise from $10.42 to $12.50 per month).

#### *Obligations and By–laws*

■ The Board recognized that there is a difference between the former locals' by–laws and those of Local 600M, in that the latter set of by–laws restrict members' rights to accept outside employment. The Board, however, citing the lack of evidence that Local 600M ever enforced the restrictions, found no significant change. The Board relied on the premise, cited above, that actual practice, not policy, controls. *See Sullivan I,* 38 F.3d at 66–67. But there was no evidence here that the by–laws were not followed on this issue: thus, the only evidence we find on this record is the restriction itself. *See id.* Accordingly, we find that Sullivan has met its burden of showing significant change, and the Board's conclusion lacks substantial evidentiary support.

#### *Voting*

Finally, Sullivan argues that a fundamental difference has been made in the locals' character: Local 109C was comprised exclusively of pressmen, and Local 139B of bookbinders, but Local 600M includes a mix of different printing industry workers. Similarly, while the original locals were limited to the city of Lowell and its environs, the territorial jurisdiction of Local 600M extends throughout eastern Massachusetts and part of New Hampshire. More importantly, Sullivan emphasizes that through the transfer, its employees in Locals 139B and 109C went from being part of locals with 8–10 and 40 members, respectively, to membership in a local of over 700 people. Sullivan concludes that such a dramatic increase in size would result in a severe diminution of voting strength, a factor the Board has considered in finding a question concerning representation has been raised. *See, e.g., Pacific Southwest Container, Inc.,* 283 N.L.R.B. 79, 80, 1987 WL 109286, at *2 (1987). Sullivan notes that

even where a merger is between two locals of the same international, as the administrative transfer is here, the Board has found a lack of continuity where there was a similar disparity of size. *See Quality Inn Waikiki*, 297 N.L.R.B. 497, 502-503, 1989 WL 224495, at *10 (1989).

In making its comparison in substantial continuity cases, the Board generally looks at the local in question immediately before the affiliation, merger, or transfer. *See e.g., Seattle–First*, 290 N.L.R.B. at 571-572, 1988 WL 213911 at *2. Here, however, the Board, without citing any authority, expanded the period in this case to include the locals' position prior to NADCO's closing. Accordingly, the Board concluded that the merger left the members of the locals in their historical position: "a small segment of a larger local representing similar craft employees within the same geographic area under the same International." *Sullivan II*, 317 N.L.R.B. at 565, 1995 WL 318651 at *7.[6] It argues again now that the proper comparison in terms of size is between the historic size of the locals—about 240 for Local 139B and 125 for Local 109C in 1990—and not their size right before the merger, as membership had been diminished by NADCO's closing. Viewed from that perspective, appellee calculates, prior to NADCO's closing employees of Sullivan constituted about seven percent of the membership of each local; now, Sullivan's employees are 28 of 700, or about four percent, of Local 600M. However, we need not determine here whether the Board erred in considering the pre-NADCO closing figures, for we find that, even assuming Sullivan can establish that there are significant differences in voting power, there is still substantial continuity between Locals 109C and 139B and Local 600M.

Whether a merger, transfer, or affiliation substantially changes a local is a question of degree. Our measure of the changes here reveals that it falls somewhere in the gray area between a complete transformation in identity and no change at all. On balance, while we recognize that significant changes

have been wrought in the locals' by-laws and assets—and, for Local 139B, in its leadership—the weight of the factors we have examined leads us to conclude that the changes are not sufficiently dramatic to alter the identity of the bargaining representative and raise a question concerning representation.

We do not reach this conclusion merely because the majority of the factors we examined weigh in favor of affirming the NLRB's decision: this is not a mathematical analysis. Simply put, we cannot find that the changes here—an increase in assets, a new local by-law restricting outside employment, a change in leadership due to the previous officers' refusal to stay on, and a decrease in immediate voting strength—substantially changed the local when it is governed by the same International constitution and by-laws, when the system for contract proposal, negotiation, and ratification as well as for grievances and strike votes is substantially the same as before, and when even the dues have stayed essentially the same. Accordingly, we affirm the Board's finding of substantial continuity.

## II. *Local 600M*

 Sullivan's contract with Local 139B provided for the checkoff of employees' union dues upon their written authorization. In its decision and order, the Board refused to order Sullivan to honor the dues checkoff provision of the expired bookbinders' contract. The Board stated that it did so because the bookbinders' agreement had expired, and "it is well settled that the checkoff obligation does not survive contract expiration." *Sullivan II*, 317 N.L.R.B. at 566, 1995 WL 318651 at *9 n.15. The Union then filed a request for reconsideration of the remedy, which the Board denied. Before us, Joint Petitioners Local 600M and the GCIU (together, the "Union"), argue that the Board erred.

 In reviewing the Union's claim, we will not substitute our judgment for the Board's. We treat the Board's choice of remedy with particular deference: "[a] Board–ordered remedy 'should stand unless

---

**6.** The International Union's constitution permits it to rescind or suspend the charter of any local with fewer than 50 members.

it can be shown that [it] is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Pegasus Broadcasting of San Juan, Inc. v. NLRB*, 82 F.3d 511, 513 (1st Cir.1996) (quoting *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218–19, 87 L.Ed. 1568 (1943)).

The Union first contends that the Board has not met its obligation to explain its decisions and support those decisions with substantial evidence, in either the original decision and order or its order denying the request for reconsideration. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). Accordingly, it asks that we remand the Board's order for clarification and reconsideration. *See NLRB v. Food Store Employees Union*, 417 U.S. 1, 9–10, 94 S.Ct. 2074, 2079–80, 40 L.Ed.2d 612 (1974).

We find that remand is unnecessary, as the Board has in fact explained and supported its decision, unlike in *Burlington Truck Lines*, on which the Union relies. *See Burlington Truck Lines*, 371 U.S. at 167, 83 S.Ct. at 245 ("There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion."); *see also District 1199P v. NLRB*, 864 F.2d 1096, 1100 n. 3 & 1102 (3d Cir.1989). The Board found the pertinent fact—that the contract had expired—and applied the relevant law—that a checkoff obligation does not survive contract expiration. The two cases the Board relies on support its statement of the law. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198–99, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991) (noting that the Board has held that dues check-off provisions are excluded from the general rule that "an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment"); *Indiana & Mich. Elec. Co.*, 284 N.L.R.B. 53, 55, 1987 WL 89684, at *3 (1987) ("The exception ... permitting unilateral abandonment of ... checkoff arrangements after contract expiration is based on the fact ... that '[t]he acquisition and maintenance of union membership can-

not be made a condition of employment except under a contract which conforms to the proviso to Section 8(a)(3).'" (quoting *Bethlehem Steel*, 136 N.L.R.B. 1500, 1502 (1982))); *see also Ortiz Funeral Home Corp.*, 250 N.L.R.B. 730, 731 & n. 6, 1980 WL 12092 (1980), *enforced* 651 F.2d 136 (2d Cir.1981), *cert. denied*, 455 U.S. 946, 102 S.Ct. 1445, 71 L.Ed.2d 659 (1982). That the Board's conclusion was made succinctly does not defeat its logic.

Second, the Union argues that *United Rubber, Cork, Linoleum and Plastic Workers of America, Local 250 (Mack–Wayne Closures)*, 290 N.L.R.B. 817, 1988 WL 214001 (1988), *supplemented*, 305 N.L.R.B. 764, 1991 WL 258339 (1991), applies here. That case addressed what remedy applies when a union breaches its duty of fair representation with regard to processing an employee's grievance. The Board held that once the General Counsel meets its initial burden of proving that the underlying grievance was "not clearly frivolous," the burden shifts to the union to establish that the grievance was not meritorious. If it cannot, the employee will be awarded back pay. *See* 290 N.L.R.B. at 820, 1988 WL 214001 at *5.

Specifically, the Union agrees that if Sullivan had bargained in good faith with the Union, under *Litton* and *Indiana & Michigan Electric* Sullivan would not have committed an unfair labor practice by refusing to continue in effect the dues checkoff provision of the expired contract. However, the Union points out, Sullivan did not bargain in good faith here; indeed, it committed an unfair labor practice. Accordingly, the Union continues, under *Mack–Wayne Closures*, any uncertainty created by Sullivan's refusal to bargain should be assessed against it. *See id.* at *3 (noting that forcing the union to bear the risk of uncertainty was "in keeping with traditional equitable principles that the wrongdoer shall bear the risk of any uncertainty arising from its actions"). Here, the Union posits, the uncertainty concerning whether Sullivan would have agreed to continue in effect the dues checkoff provision pending agreement or impasse on a new contract should be assessed against Sullivan. Therefore, the Union concludes, Sullivan should be

ordered to make the Union whole by remitting dues for the bookbinder unit employees for the entire period from the date Sullivan ceased doing so, with interest. Refusal to do so, the Union maintains, would reward Sullivan for its unlawful refusal to recognize and bargain with the Union.

The Board responds that *Mack–Wayne Closures* is distinguishable. Contrary to the Union's contention, the Board argues, *Mack–Wayne Closures* did not rest solely on the principle that uncertainty should be resolved against the wrongdoer whose conduct created the uncertainty. It also rested on two other considerations. First, the Board noted that "the union obviously [had] more particular knowledge regarding the merits of the underlying grievance than the General Counsel," such that the case fell within the principle that "the burden of establishing a particular matter will often be placed on the party with special knowledge regarding that matter." 290 N.L.R.B. at 819, 1988 WL 214001, at *4. This consideration does not apply here. Second, the Board argues, *Mack–Wayne Closures* also stressed "the special character of the grievance-arbitration process, where the employee is in effect 'presumed' to be 'innocent.'" *Id.* 1988 WL 214001 at *5. If the burden were not shifted, the employee would lose a procedural and tactical advantage, i.e., of having the employer bear the burden of proof. *Id.* at *4. The Board points out that no similar loss of rights is demonstrable in this case, which involves the denial, not of rights under an existing contract, but of the opportunity to negotiate a new contract.

The Board notes that it based its refusal to issue a prospective order on the "settled principle" that such provisions do not survive the expiration of the contract, because the Labor Management Relations Act, 29 U.S.C. § 186(c)(4), permits dues checkoff arrangements only as part of a valid collective bargaining agreement. *See Litton,* 501 U.S. 190, 199, 111 S.Ct. 2215, 2221–22, 115 L.Ed.2d 177 (1991). Also, it points out, it cannot order an employer to agree to a checkoff provision, even where the employer's refusal to agree to such a provision is based on a desire to frustrate agreement and

not on any legitimate reason. *See H.K. Porter Co. v. NLRB,* 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970) ("[A]llowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.").

Similarly, the Board maintains, the remedy for unlawful repudiation of a contractual checkoff provision cannot extend beyond the expiration date of the contract, where the employer has not agreed to a subsequent contract containing such a provision. *See Ortiz Funeral Home Corp.,* 250 N.L.R.B. at 731 & n. 6 (noting that "a union's right to dues checkoff ... is extinguished on expiration of the collective-bargaining agreement creating that right"). The Board concludes that nothing in the record could enable it to determine whether, or when, the parties would have reached agreement on a new contract if Sullivan had not refused to bargain. Since the Board would be left having to decide, in essence, what the parties should have agreed to, it contends that it properly declined to speculate.

We find the Board's reasoning persuasive. Simply put, it is too far a reach to extrapolate the Board's fairly narrow reasoning in *Mack–Wayne Closures* into this context. *See Mack–Wayne Closures,* 290 N.L.R.B. at 820, 1988 WL 214001, at *5 (describing the specific circumstances in which the burden of proof shifts to the union). The Union has not presented any authority that would help us close that gap. Accordingly, as the Union has not shown that the Board's remedy is " 'a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act,' " *Pegasus Broadcasting,* 82 F.3d at 513 (quoting *Virginia Elec. & Power Co.* 319 U.S. at 540, 63 S.Ct. at 1218), we affirm the Board's denial of the request to honor the dues checkoff provision.

## CONCLUSION

The mere fact that a majority of the members of both Locals 109C and 139B voted for the administrative transfers at issue here does not, and cannot, resolve the question of whether a question of representation has

arisen. "In determining whether a 'question concerning representation' exists because of lack of continuity, the Board is not directly inquiring into whether there is majority support for the labor organization after the changes at issue, but rather is seeking to determine whether the changes are so great that a new organization has come into being—one that should be required to establish its status as a bargaining representative through the same means that any labor organization is required to use in the first instance." *Western Comm'l Transp., Inc.*, 288 N.L.R.B. 214, 217, 1988 WL 213704, *5 (1988). Nonetheless, as the Supreme Court recently commented,

> [t]he Board is ... entitled to suspicion when faced with an employer's benevolence as its workers' champion against their certified union, which is subject to a decertification petition from the workers if they want to file one. There is nothing unreasonable in giving a short leash to the employer as vindicator of its employees' organizational freedom.

*Auciello Iron Works, Inc. v. NLRB*, —— U.S. ——, ——, 116 S.Ct. 1754, 1760, 135 L.Ed.2d 64 (1996).

For the reasons stated above, we **affirm.**